PFISTER et al. v. COW GULCH
OIL CO. et al.

No. 4133.

United States Court of Appeals
Tenth Circuit.

May 18, 1951.

Rehearing Denied June 11, 1951.

J. R. Strickland, Denver, Colo. (Strickland, Strickland & Tull, Denver, Colo., on the briefs), for appellants.

Warwick M. Downing, Denver, Colo. (Richard Downing, Denver, Colo., on the brief), for Cow Gulch Oil Co.

W. J. Wehrli, Casper, Wyo. (Ewing T. Kerr, Cheyenne, Wyo., on the brief), for Atlantic Refining Co.,

Before PHILLIPS, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

On May 2, 1938, the State of Wyoming executed and delivered an oil and gas lease to William J. Pfister, as lessee, covering S 36 T 35 N R 66 W, in Niobrara County, Wyoming. The lease was for a term of 10 years, expiring May 1, 1948.[1]

On August 2, 1945, Pfister, by an instrument in writing, assigned and transferred such lease to Cow Gulch Oil Company,[2] subject to prior assignments of royalty interests by Pfister to Rider and J. W. Allsup. The assignment reserved to Pfister an overriding royalty of 2½ per cent. Cow Gulch paid Pfister $1,000 consideration for the assignment. On the same day, Cow Gulch and Pfister, as a part of the same transaction, executed a collateral agreement in writing. That agreement in part provided that Cow Gulch should have and exercise all the rights of ownership of the leasehold estate with full power to develop

---

1. Hereinafter referred to as the original lease.

2. Hereinafter called Cow Gulch.

and operate the same and that during such time as it held the leasehold estate it should pay all accruing rentals to the State of Wyoming; that Cow Gulch, upon 30 days' written notice to Pfister, might surrender the lease, and that in case Cow Gulch should not discover oil upon the leased premises within three years from August 2, 1945, it should surrender the lease and assign it to Pfister; that if, at the expiration of the 10-year term of said lease, Pfister or Cow Gulch should secure a renewal or extension of such lease, or should secure a new lease from the State of Wyoming covering such Section 36, the terms of the collateral agreement, except the provision respecting the consideration, should apply to any such renewal, extension, or new lease; that if such renewal, extension, or new lease should be acquired by Cow Gulch, it should assign to Pfister the same overriding royalty that was reserved by Pfister in the assignment of August 2, 1945; and if such renewal, extension, or new lease should be acquired by Pfister, such renewal, extension, or new lease should be assigned by him to Cow Gulch, reserving to Pfister an overriding royalty of 2½ per cent. The collateral agreement was filed for record, but the register of deeds in transcribing the instrument on the records omitted the acknowledgment and failed to show it had been acknowledged.

On March 5, 1948, Cow Gulch and The Atlantic Refining Company [3] entered into a written agreement by which Cow Gulch agreed to transfer to Atlantic leases on 4,500 acres of land in Niobrara County, Wyoming.

On May 2, 1948, Cow Gulch obtained a new lease [4] from the State of Wyoming for a term of 10 years on such Section 36. By supplemental agreement the new lease was included in the leases to be transferred to Atlantic. On August 30, 1948, Cow Gulch assigned the new lease to Atlantic, reserving an overriding royalty of 2½ per

cent. Atlantic paid as a consideration for such assignment, $821. Cow Gulch paid the state rentals as they accrued on the original leases and Cow Gulch or Atlantic paid the rentals on the new lease as they accrued.

On May 20, 1949, Atlantic commenced the drilling of two wells on such Section 36. One was drilled to a depth of 3,991 feet and is now a producing well in the Sundance sand. The other well was drilled to a depth of 1,792 feet to the Muddy sand, and then abandoned.

On May 22, 1949, A. N. Runquist, an associate of Pfister, who had assisted him in obtaining the original lease, and who owned a share in the 2½ per cent overriding royalty reserved by Pfister, wrote a letter to Pfister stating that Cow Gulch had obtained the new lease from the State of Wyoming and had assigned it to Atlantic, and that if Cow Gulch had not surrendered the original lease to Pfister, his interests were protected, and that Atlantic had moved in equipment to drill a test well on such Section 36. Pfister received the above letter in due course and by letter to Runquist, dated July 6, 1949, replied thereto, in part, as follows: "I am glad to know they are going to put down another hole on our lease. As I understand our lease we are protected on any deal as long as the Cow Gulch keeps the lease."

On August 8, 1949, the producing well was brought in on such Section 36 and on August 12, 1949, Pfister was notified thereof by telegram from Runquist. On September 1, 1949, the well was completed and placed on production. Since that date, it has produced about 100 barrels of oil per day. Up to March 31, 1950, it had not produced sufficient oil to pay drilling costs and operating expenses.[5]

On July 16, 1949, Pfister and Huey advised Clio L. Kem, vice president of Cow Gulch, that Pfister had lost his papers and wanted to be assured that he had the overriding royalty in the lease from the State

3. Hereinafter called Atlantic.

4. Hereinafter referred to as the new lease.

5. From September 1, 1949, to March 31, 1950, the production was 26,758 barrels,

of the value of $69,001. Atlantic expended in development of the lease $168,326.12, and the operating expenses for the period of production stated above were $7,475.12.

of Wyoming to Cow Gulch. Kem was unable to find Cow Gulch's copy of the collateral agreement because it was in the file of the attorneys for Cow Gulch. Kem showed Pfister a letter from Cow Gulch to Atlantic containing a proviso that Pfister's 2½ per cent overriding royalty should be paid. On July 18, 1949, Kem took the matter up with a representative of Atlantic and Atlantic agreed that it would assign such overriding royalty to Pfister. Atlantic was willing to assign such overriding royalty to Pfister, but Atlantic and Pfister were unable to agree on the specific terms of such assignment. During the course of the negotiations with respect to the terms of the assignment, Pfister asserted no claim to any interest in the lease other than 2½ per cent overriding royalty, and made no demand for an assignment of the lease.

On October 5, 1949, Pfister, Rider, and Huey entered into an agreement with Snyder, by which the latter, for a contingent interest, agreed to prosecute their claims against Atlantic. On the same day, Snyder notified Alantic by long distance telephone that Atlantic had made a "slip up" and demanded a settlement of $100,000 cash $400,000 to be paid out of oil, and a five per cent overriding royalty.

On October 13, 1949, Pfister, Rider, Huey and Snyder commenced this action against Cow Gulch and Atlantic, seeking a judgment decreeing that Cow Gulch and Atlantic assign the new lease to them and quieting their title to such leasehold estate.

The trial court found that the recording was defective and did not impart constructive notice to Atlantic; that Atlantic acquired the assignment of the new lease as a subsequent purchaser in good faith and for a valuable consideration, and without notice, actual or constructive, of the collateral agreement; that Atlantic went upon the leased premises and expended substantial sums in the development thereof; that Pfister waived any breach of the collateral agreement and that he was barred by estoppel and laches from asserting a right to an assignment of the new lease.

By its judgment, the court decreed that Atlantic was the owner of the new lease, subject to an overriding royalty of 2½ per cent reserved by Cow Gulch and subject to an additional overriding royalty of 2½ per cent, of which Allsup owned .36 of 1 per cent; Rider .288 of 1 per cent; Huey .072 of 1 per cent; Runquist .36 of 1 per cent, and Pfister 1.42 per cent.

The primary contention of appellants is that the assignment of the original lease by Pfister to Cow Gulch and the collateral agreement constituted an "unless" sublease of the original lease and of the new lease when it came into being and that such sublease expired by its terms when neither Cow Gulch nor Atlantic discovered oil on such Section 36 prior to August 2, 1948.

It is well settled that an "unless" lease terminates automatically upon the failure of the lessee to perform the condition of the lease, either to drill or to pay the stipulated delay rental within the time specified in the lease.[6] But, here, the original lease expired by its terms and on May 2, 1948, Cow Gulch, acting in accordance with the terms and intent of the collateral agreement, acquired the new lease on such Section 36 from the State of Wyoming running for a term of 10 years from May 2, 1948. On acquiring such new lease, it became the obligation of Cow Gulch to assign to Pfister an overriding royalty therein of 2½ per cent. When neither Cow Gulch nor Atlantic discovered oil on such Section 36 prior to August 2, 1948, under the terms of the collateral agreement Pfister then became entitled to an assignment of the new lease from Atlantic, provided it was charged with notice of the collateral agreement. But neither the assignment nor the collateral agreement contained any provision for automatic termination of the assignment on the failure to discover oil within the stipulated period. Rather, the collateral agreement provided in such event for an assignment to Pfister. Only by an assignment could the rights of Atlantic in the new lease have become vested in Pfister. It is too plain to require further ex-

6. Gloyd v. Midwest Refining Co., 10 Cir., 62 F.2d 483, 485, and cases there cited; Summers Oil and Gas, Perm.Ed., Vol. 2, § 337, pp. 212, 213.

position that under no theory of termination could the rights of Atlantic in the new lease, which was lawfully acquired by Cow Gulch and which had lawfully passed to Atlantic by assignment, become vested in Pfister.

The instant case is clearly distinguishable from McCrabb v. Moulton, 8 Cir., 124 F. 2d 689, relied on by appellants, where the agreement contained a provision that if the assignee failed to commence a well on or before a stipulated date, the assignment should become null and void, and the assignee had not acquired a new lease from the lessor.

Pfister, with knowledge of the fact that Atlantic had commenced drilling operations on such Section 36, stood by and permitted it to expend large sums of money in drilling two wells and in bringing in one producing well on such Section 36. Continuously, from the middle of July, 1949, until early October, 1949, Pfister took the position that he was entitled to an assignment of an overriding royalty of 2½ per cent, and it was not until October 13, 1949, long after the producing well had been completed, that he demanded an assignment of the new lease.

Laches consists of two elements, inexcusable delay in instituting suit and prejudice resulting to the defendant from such delay. Its existence depends upon the equities of the case, and not merely upon the lapse of time. A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risks of the enterprise. The injustice of permitting one, holding the right to assert an interest in property of a speculative character, to voluntarily await the event and then decide, when the danger is over and the risk has been that of another, to come in and share the profit, is obvious. In such circumstances, persons having claims to property are bound to use the utmost diligence in enforcing them.

Silence under such circumstances when, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred. Where a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced.[7]

We conclude that Pfister was barred by laches from demanding an assignment of the new lease.

We deem it unnecessary to determine whether the recording of the collateral agreement constituted constructive notice to Atlantic.

The judgment is affirmed.

---

7. Alexander v. Phillips Petroleum Co., 10 Cir., 130 F.2d 593, 604, 605, and cases there cited; Preston v. Kaw Pipe Line Co., 10 Cir., 113 F.2d 311, 313; Winn v. Shugart, 10 Cir., 112 F.2d 617, 622–623; Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214.