Gilbert **OTTENBERG**, Assignee of Fanny Ottenberg, Plaintiff,

v.

Florence **OTTENBERG**, Individually, and as Executrix, etc. et al., Defendants.

Civ. A. No. 3013–58.

United States District Court
District of Columbia.

May 2, 1961.

Wilkes & Artis, Washington, D. C., for plaintiff.

James M. Earnest, Washington, D. C., for defendants.

LEONARD P. WALSH, District Judge.

This matter comes before the Court on a complaint for payment of money and transfer of corporate stock filed by the plaintiff, as assignee,[1] under an agreement dated November 26, 1958, of the claim of his mother, Fanny Ottenberg, arising out of an alleged agreement between Joseph and Fanny Ottenberg and their son and his wife, Melvin and Florence Ottenberg (hereafter often referred to by their first names). A chronology of events leading up to the filing of this suit is attached as Exhibit A.

The problems involved in this controversy are complicated by the fact that of the five parties having knowledge of the alleged agreement, three of them are deceased, namely: Louis Ottenberg, a son of Joseph and Fanny, and an attorney, who drew up the agreement; Joseph Ottenberg, the father, and a party to the agreement; and Melvin Ottenberg, a son, and a party to the agreement. And further, the mother, Fanny Ottenberg, by reason, among others, of the infirmities of old age, is too ill to testify; and further, Fanny Ottenberg and Florence Ottenberg, it seems fair to infer, were not nearly as knowledgeable of the facts surrounding the agreement as were the decedents.

For a number of years Joseph Ottenberg conducted a sole proprietorship bakery business in the District of Columbia, in which he was assisted by his wife, Fanny. About 1930, the son, Melvin, was employed in the business, and some time later a Florence Samler was also employed. Melvin and Florence were married on October 7, 1945.

In December, 1946, Ottenberg's Bakers, Inc., a defendant herein, was formed as a District of Columbia corporation. Joseph Ottenberg was issued 250 shares of stock (Certificate No. 1, Joseph Ottenberg, 249 shares, and Certificate No. 2, Fanny Ottenberg, 1 share) in consideration of his contribution of the bakery business to the corporation. Melvin Ottenberg was issued 150 shares of stock (Certificate No. 3, Melvin Ottenberg, 149 shares, and Certificate No. 4, Florence Ottenberg, 1 share), in consideration of his transfer to the corporation of certain real estate and the equipment of another bakery (Sunrise), which he had just purchased, subject to the assumption by the corporation of a named indebtedness of Melvin Ottenberg.

With respect to Melvin's contribution to the corporation, it is plaintiff's claim that a majority of such contribution was underwritten and indeed furnished by Joseph Ottenberg prior to the transfer from Melvin to the corporation.[2]

Some time between January 3 and March 1, 1947, Joseph Ottenberg, Fanny Ottenberg, Melvin Ottenberg, and Flor-

1. Restatement, Contracts, §§ 149, 150, and 151 (1932).

2. Melvin had purchased the Sunrise Bakery, located on Morse Street, N. W., Washington, D. C., and it was this property he contributed to the new corporation. However, it is claimed by the plaintiff that much of the purchase money and certain reimbursement was made to Melvin by Joseph for the Sunrise Bakery exchange, as follows:

Melvin Paid—
| | |
|---|---|
| By deposit (loaned by Joseph) | $ 1,000.00 |
| At settlement ($4500 loaned by Joseph) | 10,254.07 |
| Taxes | 280.54 |
| Insurance | 164.41 |
| Interest | 441.12 |
| On principal of trust (loaned by Joseph) | 1,757.51 |
| Accrued interest (loaned by Joseph) | 215.42 |
| Total | $14,113.07 |

Melvin Received—
| | |
|---|---|
| Increase in salary | $5,000.00 |
| Rent for property, 8/1/46 to 12/31/46 | 5,000.00 |
| Expense allowance | 5,125.00 |
| Income tax deductions | 9,800.00 |

However, Florence Ottenberg testified at the hearing on this matter that a substantial portion of the amount paid at settlement was money withdrawn from her bank account and given to Melvin.

ence Ottenberg entered into an agreement under seal. The two basic provisions of this agreement, which are in controversy here, provided substantially as follows:

1. That if, while either Fanny or Joseph Ottenberg is living, the sums received by them, or the survivor of them, from the defendant, Ottenberg's Bakers, Inc., by way of compensation, bonus, dividends, or otherwise, shall be less than $6,000 per year, Melvin Ottenberg shall pay to his parents, Fanny and Joseph Ottenberg, or the survivor of them, such sum or sums as may be necessary to provide them, or the survivor of them, with an income of not less than $6,000 per year from said corporation and/or from Melvin Ottenberg; and

2. That all of the stock of the corporation should be endorsed in blank and delivered to the attorney, Louis Ottenberg, as trustee. It was then provided that upon the death of Joseph and Fanny Ottenberg, the trust should cease, and the stock should be delivered to Melvin Ottenberg. However, if Melvin Ottenberg were to die before the termination of the trust as noted, then all of the stock was to be delivered to Fanny Ottenberg and Joseph Ottenberg, or the survivor of them.

Fanny Ottenberg was sent a check each week from January, 1947 through December, 1955 in the sum of $100 each week. (A number of which were returned to Ottenberg's Bakers, Inc.; see letter of Fanny Ottenberg quoted below).[3]

No action was ever taken to transfer the stock certificates to Louis Ottenberg. However, on June 30, 1948, Joseph made a gift of 125 shares of the stock to Melvin and 124 shares of the stock to Florence. Meanwhile, Fanny Ottenberg, sometime in 1947 endorsed certificate No. 2, 1 share, of the stock and transferred it to Joseph. Joseph in turn, in February of 1955, apparently effected the issuance of the one share to Florence.

With respect to this gift of stock, Joseph filed a Federal Gift Tax Return for the tax year 1948 for the stock transferred to Melvin and Florence. Melvin and Florence in turn filed a Federal Donee's Information Return covering the same gift.

Meanwhile, Joseph Ottenberg died on October 26, 1955. About three months later, by a letter dated January 10, 1956, Fanny notified Melvin that she was waiving the $100 weekly payment previously made to her, subject to further notice. She also enclosed seven uncashed checks for $100 each, dated November 18 through December 30, 1955. This letter was placed by Melvin and Florence in the safety deposit box of their bank. The letter reads as follows:

"Last week I went over my financial affairs with Mr. Brady of the American Security & Trust Co., and I find that for the present at least I have no need of the payments of $100. you have been sending me. You may stop making those payments until such time as I shall ask you to resume them. I waive my rights to payments not made.

"I enclose for cancellation the following 1955 checks for $100. as I do not need them: No. 1321 of Nov. 18; No. 1360 of Nov. 25; No. 1395 of Dec. 1; No. 1462 of Dec. 9; No. 1488 of Dec. 15; No. 1937 of Dec. 22; and No. 1947 of Dec. 30."

---

3. Joseph and Fanny Ottenberg appear to have received the following yearly income from the corporation:

| Year | Amount |
|------|--------|
| 1947 | $16,617.15 |
| 1948 | 12,000.00 |
| 1949 | 15,000.00 |
| 1950 | 13,500.00 |
| 1951 | 12,601.50 |
| 1952 | 12,164.36 |
| 1953 | 18,700.00 |
| 1954 | 15,000.00 |
| 1955 (Jan 1–Oct. 26) | 7,308.02 |

These sums include the $100 and/or $50 weekly checks to Fanny Ottenberg. However, plaintiff questions the above sums on the basis of tax returns of Joseph and Fanny Ottenberg for certain years.

Melvin Ottenberg died on August 22, 1956. His widow, Florence, was named executrix and sole beneficiary under his will. She qualified as executrix by giving a special bond, conditioned, among other things, upon the payment of all of the decedent's debts. The publication of the administration of the estate of Melvin Ottenberg was made against the claims of creditors in accordance with statutory provisions, and no claims were made on account of the agreement at that time, and the assets of Melvin's estate were distributed according to the dictates of his will. The alleged value of the securities received by Florence under Melvin's will was approximately $165,000. Since Melvin's death, Florence has been the sole stockholder of Ottenberg's Bakers, Inc.

About November, 1957, Fanny Ottenberg verbally demanded that Florence resume the payments previously waived by Fanny's letter of January 10, 1956. Such payments were not resumed, and subsequently a letter, dated August 27, 1958, was forwarded by Fanny to Florence demanding resumption of the payments. The letter demand did not result in the resumption of payments, and for that reason, among others, this suit was filed.

The agreement in this case is basically one designed to provide for the care and support of the aging parents, Joseph and Fanny Ottenberg, and to leave the business to their son, Melvin, and of course his wife Florence, or other legal representatives. A fair reading of the instrument, the facts, and reasonable inferences drawn from the facts can lead to no other conclusion. The basic question thus facing the Court is whether it can give effect to the obvious intent of the parties, or, whether the agreement must fail for the reason that the parties failed to make their agreement legally binding, despite the obvious intent of the parties.

One of the first problems presented is whether there was consideration for the agreement such as to amount to a binding contract. As noted in the instrument itself, the consideration was stated to be for the "love and affection, and of the mutual undertakings, promises and agreements [t]herein contained * * ". It is noted that there was an undertaking by Melvin Ottenberg that Joseph and/or Fanny Ottenberg should receive $6,000 a year from the operation of the bakery, i. e., "from said corporation and/or from Melvin." There was also the undertaking by Joseph and Fanny that in the event of their death, all their stock in the company should be delivered to Melvin or "his legal representative". It seems fair to infer that they intended Melvin's heirs should receive the stock of the company, among whom the wife, Florence, could normally be expected to be numbered, especially inasmuch as she was a co-signor of the agreement and presumably undertook to do certain things as the wife and legal representative of Melvin.

It is true that the agreement speaks of a trustee, Louis Ottenberg, who drew the instrument in question, but the role of the attorney-son, as suggested by the plaintiff, appears to be one of a stakeholder or escrow agent rather than trustee.

█ It seems clear to the Court that any attempt to create a trust here has failed. There was no transfer of the legal interest, Chicago, Milwaukee & St. Paul Railway Co. v. Des Moines Union Railway Co., 1920, 254 U.S. 196, 41 S. Ct. 81, 65 L.Ed. 219, and lacking the complete transfer or conveyance in trust, the Court cannot uphold the agreement here as a valid trust. Scott on Trusts, Vol. I, §§ 32.1, 32.2; see also, Restatement, Trusts, § 26. Furthermore, it is the finding of the Court that the parties intended the agreement as a contract for support and care rather than as a trust instrument.

█ The writing entitled "An Agreement" involved in this case is under seal, and in the opinion of the Court is a valid bilateral contract entered into with the mutual assent of the parties whose signatures are affixed thereto. Williston on Contracts, Jaeger, Vol. 1, § 103. There

are here in the eyes of the Court, as stated in Williston on Contracts, supra, p. 395: "Mutual promises in each of which the promisor undertakes some act or forbearance that will be, or apparently may be, detrimental to the promisor or beneficial to the promisee, and neither of which is void, [which] are sufficient consideration for one another." There is sufficient evidence in the case to construe the contract in favor of mutuality and to overrule any claim of want of mutuality. Carpenter Paper Co. v. Calcasieu Paper Co., 5 Cir., 1948, 164 F.2d 653.

■ It is, therefore, the opinion of the Court that while the agreement in this case fails as an attempt to create a trust, it does not fail as a binding contractual agreement supported by mutual promises. Here the plaintiff seeks a combination of both legal and equitable remedies in the one action. The Court, in determining whether to grant the remedies sought will look to the primary right of the claimed injured party, and to the alleged wrong by which that right is claimed to have been violated. The Court also considers that it has great latitude with respect to any remedy it may grant here, as to its substance, form, or its extent, with the elements of flexibility and expansiveness preserved and applied so that a new remedy may be invented, or an old one modified, in order to meet the requirements of the new situation that may exist, or to satisfy the needs of a progressive social condition, in which new primary rights and duties may have arisen and a new kind of wrong committed, to paraphrase a scholar of equity jurisprudence. Pomeroy's Equity Jurisprudence, Symons, Vol. 1, §§ 111 and 112.

There appears to have been a manifestation of mutual assent here to say the words and do the acts which were fundamentally intended by the parties to the contract, i. e., the fundamental intention being to provide that the son, Melvin, and his wife, get the business and that Joseph and his wife be provided for from the proceeds of the business, through Melvin, or his legal representative. See Williston on Contracts, supra, §§ 20 and 21; and Ray v. William G. Eurice & Bros., Inc., 1952, 201 Md. 115, 93 A.2d 272. Also, a portion of the contract has been executed.

■ It is considered that a portion of the contract has been executed by the transfer of the stock from Joseph (after Fanny had transferred her one share to Joseph in 1947) to Melvin and Florence, proper Federal tax forms covering the gift having been filed by all parties to that transaction. One question thus presented is whether when a party to a contract puts it out of his power not to do that which he agreed to do (and by the agreement that which it was agreed a stakeholder would do under certain circumstances) by voluntarily doing such a thing prior to the time called for by the agreement, i. e., executing his portion of the contract, whether, then, when it is subsequently sought to make the other parties to the contract perform their part of the contract, such other parties may refuse to perform on the grounds that no obligation is owing or that it is not practicable or possible to perform the contract according to its terms, or that the contract was not performed by the volunteer party or parties strictly in accordance with the terms of the contract. It is the Court's opinion that the party here may not refuse to perform that part of the contract calling for payments to the aged parent, Fanny.

The defendants claim that the agreement entered into here was intended to be changed and superseded; however, there is no evidence of any change in existence and no superseding document was introduced. On the other hand, Fanny's letter to Melvin of January 10, 1956, and its subsequent retention in safekeeping is consistent with acknowledgment of the existence and continuing vitality of the 1947 agreement.

What is unclear and must be inferred from the facts existing in the case is whether the gift of Joseph was made in pursuance of the agreement of mutual promises of the parties, i. e., to transfer

the business by one set of parties and to provide care for Joseph and Fanny by the other. The main thread running through the agreement, as well as the inferences which may be drawn from the acts of the parties, leads this Court to conclude that the gift to Melvin was made pursuant to the contract and looking forward toward the execution on the part of Melvin and Florence, or Melvin's legal representative, to provide care for Joseph and/or his widow, Fanny, from the operating proceeds of the bakery business. The gift did not act, in the Court's contemplation, as a foregiveness or waiver of defendant's obligation under the contract to care for the parents, or the survivor of them, in return for the transfer to them of the business.

No case has been cited to the Court by the parties similar to the one here, but it is similar to cases involving the transfer of, or promises of transfer of, certain property to persons in return for the care and support of the transferror or others until death. Such cases are sustained in many instances on the basis of a moral obligation. See 8 A.L.R.2d 787. However, there is more than moral obligation, although there would also appear to be that, in this case for the contract is under seal and based on mutual promises, as well as partly executed, by Joseph and Fanny, and by Melvin and Florence by their payments.

▮▮ The intention and meaning of the parties to this agreement, as well as a determination as to whether there was sufficient consideration to support a contract, must be arrived at by the "application of good sense and right reason" to the particular fact situation. Jones v. United States, 1877, 96 U.S. 24, 24 L.Ed. 644; Storm v. United States, 1876, 94 U.S. 76, 24 L.Ed. 42. A fair presumption in cases of the instant type is that a person is presumed to be just before he is generous. It therefore seems fair to infer from the facts that the gift from Joseph was made in pursuance of the contract and was not an outright gift to his son. The reasonable inference, as viewed by the Court, is that a man of advanced years, as was Joseph, would provide support for himself and his elderly wife, as was contemplated by the agreement, rather than make an unconditional gift of a business out of which he received a salary and support for many years.

The fact that the payments to Joseph and Fanny exceeded $6,000 a year for a number of years, until the payments were waived by Fanny, does not weigh against the existence of a contract in this case, in the Court's opinion. The $6,000 is stated in the agreement as a "floor" over which, additional payments in salary and otherwise could be made. Also, a part, or the entire, $6,000 payment could be waived without vitiating the agreement.

That Fanny Ottenberg did claim an amount less than $6,000 a year and waived her rights under the agreement for a period seems not to be contrary to the law, and indeed, appears to have been regarded by Melvin as an important concession on her part by reason of the manner in which he provided for the safekeeping of the document. At the same time, it was a gesture on Fanny's part, and also on Melvin's part, which is inconsistent with the concept of no agreement. However, since the waiver was issued in writing, the demand for the resumption of payments under the agreement can reasonably be expected to be effective only from the date of Fanny's written demand, August 28, 1958.

▮ Since the general rule is that a contract will be upheld where it is susceptible of two meanings, one of which will render it valid, and there is such a meaning which will uphold this contract as valid and subsisting, it will be so held. Intermountain Building and Loan Association v. Gallegos, 9 Cir., 1935, 78 F.2d 972, 973, certiorari denied 296 U.S. 639, 56 S.Ct. 172, 80 L.Ed. 454.

It should be noted that in the Gallegos case, suit was brought by holders of "Installment Savings Certificates" seeking status in a receivership as creditors rather than as stockholders, although the certificates in question contained the words

"stock" and "shares". The court held, however, that it was axiomatic "that the character of contracts is determined by their provisions, and not by their labels"; and so they held a contract was created. This rule is held equally applicable here wherein there was reference to the word "trustee", etc.

As has been pointed out previously, no case has been cited by either party which is similar to the one before the Court. However, since the ascertainment of the intent of the parties is gathered from the language of the contract and the attendant circumstances at the time of entering the contract, Shillinglaw v. Commissioner of Internal Revenue, 6 Cir., 1938, 99 F.2d 87, 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036, the Court is constrained to put itself in the position of the parties as of the time the contract was entered into, and to construe the contract with the idea of effectuating the agreement, Rocky Mountain Fuel Co. v. Albion Realty & S. Co., 10 Cir., 1934, 70 F.2d 212; Baker v. W. J. Kennedy Dairy Co., 6 Cir., 1935, 77 F.2d 574, certiorari denied 296 U.S. 634, 56 S. Ct. 157, 80 L.Ed. 451. Therefore, in construing the contract here, wherein the agreement is somewhat ambiguous, the Court looks to the apparent purpose of the parties in entering into the contract, the history of the negotiations leading up to such contract, the expressions of the parties or their agents, as to their mutual understanding of the language of the agreement to the extent that such is available or admissible in this case, as well as to any acts of interpretation by the parties themselves, the relation and condition of the parties, and all facts and circumstances leading up to the signing and execution of the contract. White Star Bus Line v. People of Puerto Rico, 1 Cir., 1935, 75 F.2d 889, certiorari denied 296 U.S. 606, 56 S.Ct. 123, 80 L.Ed. 430.

It is, therefore, considered that by interpreting this agreement as a valid contract for support, and upholding it as such, the Court is following the weight of authority in the interpretation of contracts. In so doing, the Court is of the opinion that it is giving effect to the main apparent purpose of the agreement of the parties, even if it cannot give effect to all of the provisions of the agreement. Coffey v. Day & Night National Bank of Pikeville, D.C.E.D.Ky.1926, 21 F.2d 661, affirmed Day & Night Nat. Bank of Pikeville Coffey, 6 Cir., 1928, 25 F.2d 403, 58 A.L.R. 1002.

The Court's position in this matter is believed to be in accord with the public policy of this jurisdiction. Title 46, Sections 201 and 212, D.C.Code (1951), provides, in effect, that persons seeking to be placed on public assistance rolls who have insurance proceeds or other property are obliged to subject their estates for an indebtedness in the amount of payments made to them by the District of Columbia government for such public assistance. There is thus the public policy of seeking remuneration from the estates of parties who are on the public assistance rolls. If persons on these rolls were permitted to give or to sign away their property with an understanding that they be cared for by the relatives to whom such gifts are made or to whom such property is conditionally transferred, and later such an agreement could be treated as void by such relatives and the parties of the first part of such agreements become improvident and must be cared for by the District of Columbia Government, an injustice would be worked on the District Government and on the taxpayers of the District of Columbia. In addition, Title 46, Section 211, provides for the liability of relatives for the support of persons provided for by the District of Columbia Government under old age assistance laws. This would appear to be further evidence of a strong public policy in favor of upholding contracts which would insure the support of parties who have attempted to provide for their own support in their old age and at the same time effect the transfer of properties and businesses to their heirs or relatives prior to death

While there is no evidence in this case that Fanny Ottenberg is suffering from financial need, the question of whether the protection from improvidence was an element in making the agreement must, it would seem, be looked at as of the time of the signing of the agreement, and taking account of the fact that such agreements are most often entered with the knowledge that though the older parties (Joseph and Fanny here) might be financially independent as of the time of signing, but that the vagaries of life often result in the diminution of life's savings, provision for care in old age would therefore seem to be a prime condition of any agreement for the transfer of a business prior to the death of the older parties to the agreement such as is involved in this case.

It may be objected to by the defendants that no case has arisen in this jurisdiction which establishes a precedent for the Court's holding here that the agreement entered into by the Ottenbergs is a valid contract calling for the enforcement of the support payment provision as stated therein. However, the fact that this is one of the "open spaces" in the law in this jurisdiction will not deter the Court from properly filling such void. The Court rests its opinion, however, on the bases that it has filled this open space in the law with a view to the social interests which seem to be involved, with such aid as could be obtained from authorities elsewhere, and from logic, history, custom, utility, and the accepted standards of right conduct. Clark v. Associated Retail Credit Men of Washington, D. C., 1939, 70 App.D.C. 183, 105 F.2d 62.

 Defendants herein have objected to the ruling of the Court with respect to the Court's refusal to receive in evidence the testimony of Louis Ottenberg with respect to the purported intentions of Joseph and Melvin Ottenberg as they related to the agreement. The testimony of Louis Ottenberg, now deceased, was attempted to be introduced by way of deposition. Plaintiff objected on the basis of the hearsay rule, and defendants claimed it should be admitted under an exception to that rule.

The Court, in the exercise of its discretion, and after hearing argument by counsel for the respective parties, refused to receive the deposition in evidence. It was the opinion of the Court that where the testimony of Florence, one of the signors to the agreement, was introduced, and the deposition of the widow, Fanny, was available, there was no real necessity for the admission of the attorney Louis Ottenberg's deposition. Also, the plaintiff's counsel alleged, and plaintiff testified, that something of a feeling of animosity existed against Fanny on the part of Louis. In view of this, the hearsay rule was held to apply to Louis' deposition.

 It is the opinion of the Court that the claim of the plaintiff is valid as against Florence Ottenberg, in her individual capacity. She, as co-signor with Melvin of the agreement, was a party and received part of the stock given by Joseph pursuant to the agreement. Also, since the vitality of the agreement was sustained and reliance made upon it through August of 1958, the Court refuses to entertain the defendant's defense of laches on the part of Fanny and her assignee. Any delay in making the claim here is considered excusable or justifiable on the basis of the facts in the case.

Findings of fact and conclusions of law are considered to be fully set forth in this Opinion, and therefore specific findings and conclusions would in the Court's opinion, be superfluous.

Counsel for plaintiff will submit an appropriate order and judgment to the Court within five days of the date of this opinion.

Exhibit "A".

Chronology of Important Events in Ottenberg Case.

| | |
|---|---|
| Ottenberg Bakery, a proprietorship, operated in northwest Washington | Prior to 1920 until 1946 |
| Melvin Ottenberg employed by Joseph and Fanny Ottenberg in early 1930's | 1930's |
| Florence Samler employed by Joseph and Fanny Ottenberg | Prior to 1944 |
| Melvin and Florence married | 1944 or 1945 |
| Ottenberg Bakers, Inc., the corporation, formed | Dec. 30, 1946 |
| Original stock certificates issued | Jan. 3, 1947 |
| Agreement dated | Jan.–Mar., 1947 |
| Stock receipted for as follows: | |
| Cert. 1—Jseph 249 | 8/8/47 |
| 2—Fanny 1 | 8/2/47 |
| 3—Melvin 149 | 8/18/47 |
| 4—Florence 1 | 8/18/47 |
| Fanny transferred her share to Joseph | 1947 |
| Joseph gave 125 shares to Melvin and 124 shares to Florence | 6/30/48 |
| Gift tax return of donor Joseph Ottenberg filed; Donees' return also filed by Melvin and Florence | 1949 |
| Joseph gave Fanny's one share to Florence | 2/ /55 |
| Joseph Ottenberg died (Adm. 89,-185) | 10/26/55 |
| Fanny signed letter to Melvin waiving payments, subject to reinstatement | 1/10/56 |
| Melvin Ottenberg died (Adm. 91,-406) | 8/22/56 |
| Fanny verbally demanded resumption of payments | 11/ /57 |
| Fanny demanded resumption of payments waived 1/10/56 in writing | 8/27/58 |
| Assignment of claim of Fanny Ottenberg to Plaintiff, Gilbert Ottenberg | 11/26/58 |
| Suit filed | 11/29/58 |