**In re K–COM MICROGRAPHICS, INC.,**
**a/k/a Komco, Inc., Debtor.**

**K–COM MICROGRAPHICS,**
**INC., Plaintiff,**

v.

**NEIGHBORHOOD ECONOMIC**
**DEVELOPMENT CORPORATION,**
**Defendant.**

**Bankruptcy No. 88–00836.**
**Adv. No. 91–0105.**

United States Bankruptcy Court,
District of Columbia.

Oct. 8, 1993.

David A. Handzo, Jenner & Block, Washington, DC, for plaintiff.

Richard G. Wise, Greenstein DeLorme & Luchs, P.C., for defendant.

## DECISION DENYING PLAINTIFF'S MOTION FOR AMENDMENT OF JUDGMENT OR FOR NEW TRIAL

S. MARTIN TEEL, Jr., Bankruptcy Judge.

In December 1992, the court tried a breach of contract claim brought by the plaintiff K–Com Micrographics, Inc. ("K–Com"). At the trial's end, the court rendered an oral decision in favor of the defendant Neighborhood Economic Development Corporation ("NEDCO"). K–Com has moved for amendment of judgment or for a new trial. The court will deny that motion

because K–Com never adequately put NEDCO on notice that a condition precedent to performance by NEDCO—the execution of a suitable subordination agreement with the U.S. Small Business Administration (SBA)—had been met and, therefore, that under the contract NEDCO was obligated to perform. Alternatively, assuming such notice was given or was in fact unnecessary, the doctrines of waiver and equitable estoppel each support a holding that K–Com lost the right to require NEDCO to perform.

## FACTS

As in the oral decision, the court will assume, without actually deciding the issue, the existence by fall 1989 of an oral contract with the following terms. NEDCO promised to provide K–Com $450,000.00 in funding. Of that amount, $300,000.00 was to be in the form of loan with the remaining $150,000.00 in the form of a purchase of stock. K–Com was to use the $300,000.00 to purchase equipment. That investment was to be secured by a first lien on the equipment purchased and a blanket lien on the rest of the debtor's assets.

Ensuring that NEDCO would receive a first lien on the equipment purchased, gave rise to an implied condition precedent—that is, that the SBA, then the holder of a floating blanket lien on the debtor's assets, execute a subordination agreement in favor of NEDCO. This proved a stumbling block, and while the SBA did execute one subordination agreement in November 1989 ("the subordination agreement"), a mutually acceptable subordination agreement was never executed. Nonetheless, at trial K–Com insisted that the subordination agreement did in fact fulfill the condition precedent so that NEDCO was obligated to perform under the parties' oral contract.

The court rested its oral decision on four findings of fact: (1) that K–Com never demanded performance of the alleged contract from NEDCO, (2) that K–Com acted as though it acquiesced in NEDCO's position that the subordination agreement was unsatisfactory, (3) that the amount of time that passed between entering into the contract and rejecting it was more than ample for obtaining a suitable subordination agreement, and (4) that K–Com's viability as a vehicle for investment had almost completely eroded by the time the contract was rejected. Based on these findings, the court held that NEDCO was never under a obligation to perform and that NEDCO was justified in rejecting the contract. Therefore, there was no breach of contract.

Within 10 days of entry of judgment in NEDCO's favor, K–Com moved for amendment of judgment or for a new trial under Fed.R.Civ.P. 59 and 60, made applicable in these proceedings by Fed.R.Bankr.P. 9023 and 9024. In its supporting memoranda, K–Com raises numerous arguments and seeks to introduce new evidence which, it maintains, require judgment in its favor or at least a new trial. The points raised by K–Com will be addressed below.

## DISCUSSION

For the most part, in denying K–Com's motion, the court relies on its oral decision but will make additional factual findings as necessary as well as refine earlier factual findings.

### I

K–Com maintains that it was under no duty to notify NEDCO that the subordination agreement fulfilled the condition precedent because NEDCO unequivocally stated that the subordination agreement was unsatisfactory. Thus, K–Com avers, providing notice would have been a futile act. K–Com also seeks to introduce evidence that NEDCO was in fact put on notice that all conditions had been met and performance was thus due.

### A

From the general rules governing when a contracting party must demand performance from the other party, *see generally* 17A Am.Jur.2d *Contracts* § 610 (1991); 17A C.J.S. *Contracts* § 478 (1963 & Supp.1993), the common sense principle can be derived that a contracting party must provide notice or demand performance only

where the other party would have no cause to perform absent such notice or demand. In the context of a condition precedent, notice must be given only when the contracting party whose performance is conditional cannot ascertain for itself whether the condition has been met.

■ But even where demand or notice is required, a contracting party is excused from that requirement if the other party has repudiated the contract or otherwise indicated it refuses to perform. *E.g., Fargo Pub. Library v. Fargo Urban Renewal Agency*, 185 N.W.2d 500, 505 (N.D.1971); *Monroe v. Fetzer*, 56 Wash.2d 39, 350 P.2d 1012, 1014 (1960). This rule rests on the maxim that "the law does not require the doing of a useless act." *Fink v. Denbeck*, 206 Neb. 462, 293 N.W.2d 398, 401 (1980); *accord Fargo*, 185 N.W.2d at 505.

■ In this case, notwithstanding NEDCO's statements that the subordination agreement was inadequate, K–Com had a duty to inform NEDCO that the subordination agreement met the contract requirements and that therefore NEDCO's performance was expected. Providing this notice would not have been a useless act. There is no evidence K–Com and NEDCO had any understanding as to what constituted an adequate subordination agreement. Thus, it was open to debate whether the subordination agreement was adequate to fulfill the condition precedent. As a result, NEDCO, believing the subordination agreement did not meet the condition precedent, refused to accept the subordination agreement and therefore had no cause to perform. NEDCO in no way repudiated the contract but remained ready, and indicated its willingness, to perform on execution of a satisfactory subordination agreement. No evidence was introduced at trial showing K–Com conveyed its belief that the subordination agreement was satisfactory. Consequently, NEDCO never understood, nor did it have any reason to understand, it was under any obligation to perform. The parties' attempts to obtain a subordination agreement acceptable to NEDCO served to validate NEDCO's belief that the subordi-

nation agreement did not fulfill the condition precedent.

This case can be distinguished from cases like *Chemetron Corp. v. McLouth Steel Corp.*, 522 F.2d 469 (7th Cir.1975), relied on by K–Com. In that case the relevant contractual obligation was a promise to supply, on a monthly basis, a minimum amount of a product and, on written demand, to supply a further amount of the product up to a maximum amount. The obligation was straightforward and clearly spelled out in a written contract. There was never any need to resort to interpretation to delineate the parties' responsibilities under the contract. Accordingly, there was no point in demanding a performance which had been repeatedly refused and which both parties knew was not forthcoming.

In contrast here, there was no written contract provision spelling out what constituted an adequate subordination agreement. Whether the condition precedent had been met was debatable. If K–Com thought it had been met and NEDCO should therefore perform, K–Com should have let NEDCO know. Otherwise, NEDCO, who found the subordination agreement unacceptable, had no cause to perform.

### B

■ K–Com seeks to introduce new evidence of a demand for performance. It consists of an affidavit of its bankruptcy counsel, Janet Nesse, who was involved in representing K–Com in its negotiations with NEDCO and the SBA, and a letter dated December 6, 1989, from her to Lloyd Arrington, who was handling the deal for NEDCO. (Pl.'s Mot. for Amt. of J. or for New Trial, Attach. A (letter) & B (affidavit).)

In her affidavit Nesse describes a meeting held shortly before she wrote the December 6, 1989 letter. According to Nesse, she and other K–Com representatives met with Arrington to go over a list of closing documents. At the meeting Nesse and the K–Com representatives confirmed that K–Com had supplied the necessary closing

documents including the subordination agreement. They informed Arrington, Nesse continues, that K–Com believed it had fulfilled all conditions precedent to closing and, in particular, that the subordination agreement fulfilled the condition precedent of subordinating the SBA. Therefore, Nesse alleges K–Com told NED-CO that it expected NEDCO to close the deal in the very near future. Nesse further avers that in the December 6, 1989 letter to Arrington, she informed him that it was essential to settle the K–Com financing by December 10, 1989.

In the letter Nesse indicated that it was essential to settle the loan by December 10, 1989. She expressed her "understanding" that all documents requested had been supplied, noting that the SBA chose to sign the original subordination agreement. Nesse went on to address the voting trust. She reminded Arrington that "neither the complete subordination nor the voting trust were conditions of the [financing] commitment." Nesse concluded by expressing her "hope to hear from [Arrington] as soon as possible on the status of this matter."

The parties contest whether the record should be reopened under Rule 59 to admit this new evidence. The court need not decide this issue because its resolution would not affect the outcome of this case. First, the court believes that neither the affidavit nor the letter suffices to constitute a demand for performance. Second, as explained in Part II, the doctrines of waiver and equitable estoppel would each bar K–Com from enforcing the contract even if a demand for performance had been made.

As to the first point, both the affidavit testimony and the follow-up letter, when evaluated in the context of the parties' discussions, should be interpreted as an invitation to negotiate, rather than a demand for performance. Both pieces of evidence stem from discussions about two weeks after the SBA executed the subordination agreement in mid-November 1989. (Def.'s Ex. M.) NEDCO had not seen the subordination agreement before the SBA executed it. On receiving the subordina-

tion agreement, NEDCO forwarded it to its counsel, Robert Bunn. After reviewing the subordination agreement, Bunn expressed his concerns to Arrington over the telephone and memorialized them in a letter dated November 22, 1989. (Pl.'s Ex. 17.) It was only after speaking with Bunn in November that NEDCO contacted Patricia D. Jacobs, K–Com's president and founder, and first related his concerns about the subordination agreement. In fact, a letter dated November 27, 1989, from Jacobs to Michael Gallie, NEDCO's president, did not even mention the subordination agreement, but instead broached the problems caused by NEDCO's desire for a voting trust agreement. (Def.'s Ex. N.) It was Arrington who first brought up the subject of the subordination agreement in a letter dated December 4, 1989, written in response to Jacobs's November 27, 1989, letter. (Def.'s Ex. P.) In the letter Arrington stated K–Com's obligation to resubmit the subordination agreement to the SBA because K–Com had submitted the agreement to the SBA without first letting NEDCO review it.

As gathered from the parties' letters and testimony, the discussions leading up to the Nesse letter were preliminary in nature and conducted in an atmosphere of mutual cooperation and accommodation. The parties were in the midst of hammering out the fuzzy edges of their deal. They were not yet at a point of conflict where a demand for performance was necessary or even appropriate.

This is reflected in both the Nesse letter and the affidavit. In both pieces of evidence, the emphasis is on K–Com's beliefs or understanding. That evidence shows that K–Com put NEDCO on notice as to K–Com's position on the adequacy of the closing documents supplied NEDCO. But nowhere is there any indication that a demand for performance was made. The letter and affidavit instead demonstrate that what K–Com wanted from NEDCO was a response to K–Com's position so that the parties could move forward to closing as promptly as possible. This does not amount to a demand for performance but rather shows K–Com's desire and willing-

ness to negotiate further. As such, the Nesse letter is best characterized as an invitation to negotiate, rather than a demand for performance.

This conclusion is corroborated by the parties' correspondence immediately after December 6, 1989. Arrington responded first, by letter dated December 22, 1989 to Jacobs. (Def.'s Ex. S.) Arrington's letter was mainly in response to a request in Jacobs's November 27, 1989 letter for a timetable for getting the closing documents in final form. Arrington first outlined the steps NEDCO had taken and planned to take before closing as well as advising Jacobs what steps she needed to take to wrap up the deal. Arrington then discussed Nesse's letter:

I am in receipt of a letter from Attorney Janet Neese [sic], your Bankruptcy Counsel, dated December 6, 1989. I concluded from the contents of her letter you had not advised her of our November 28, 1989 meeting in which we discussed some of the issues raised in her letter—timing of the closing for this financing, acceptance and execution of the subordination agreement between SBA and NEDCO, and alternatives or modifications to the voting trust agreement.

(*Id.* at 3.) In the next paragraph, so there would be no misunderstanding, Arrington emphasized that the subordination agreement was unsatisfactory. Arrington then went on to state that contrary to assertions made by Nesse, "NEDCO's commitment is subject to mutually agreed terms between ourselves and yourself...." *Id.*

In her response to Arrington, dated January 11, 1989, Jacobs did not reiterate that the subordination agreement was adequate to satisfy the condition precedent. (Def.'s Ex. W, at 2.) Nor did she request performance. Instead, Jacobs discussed the efforts she was making to satisfy the SBA's concerns about the parties' deal. Jacobs said she had since informed Nesse about the November 28, 1989 meeting, but specifically elected to defer responding to the opinions expressed by Arrington in his letter. In closing her letter, Jacobs stated, "I trust the enclosed items complete our clos-

ing documents (*with the exception of the SBA subordination agreement*) and that we can move promptly to closure...." *Id.* (emphasis added).

The two letters exchanged by the parties after the Nesse letter corroborate that the Nesse letter was more in the form of an invitation to negotiate than a demand for performance. Jacobs confirmed Arrington's suspicion that Nesse had sent the letter without knowing about the November meeting between Arrington and Jacobs. This in itself takes away from the weight to attach to the Nesse letter. Moreover, Jacobs did not follow up the Nesse letter with another demand for performance but reserved judgment on Arrington's analysis of the state of the deal. Jacob's response is contrary to what would normally be expected after a demand for performance is made and then followed by the other party disavowing any obligation to perform. In closing, Jacobs indicated her belief that all the closing documents *except for* the subordination agreement were in satisfactory condition. In short, evaluated in the context of the parties' negotiating posture, the Nesse letter did not amount to a demand for performance.

## II

Even if the court is wrong that a demand for performance was necessary or wrong that the Nesse letter did not constitute such a demand, the doctrines of waiver and equitable estoppel would each bar K–Com from asserting breach of contract.

## A

■ "A waiver 'is ordinarily an intentional relinquishment or abandonment of a known right or privilege.'" *United States v. Robinson*, 459 F.2d 1164, 1168 (D.C.Cir. 1972) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *accord C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C.Cir.1936). Waiver is an equitable principle designed to—

avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair. It serves to prevent a party from insisting on a

right upon which he could have insisted earlier but has been found to have surrendered. *L. Orlik Ltd. v. Helme Prods. Inc.*, 427 F.Supp. 771, 776 (S.D.N.Y.1977).

 The essence of equitable estoppel is one party's reasonable reliance "on its adversary's conduct in such a manner as to change his position for the worse." *Heckler v. Community Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984) (footnote omitted; internal quotation marks omitted). The estoppel doctrine rests on "the maxim that no man may take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232, 79 S.Ct. 760, 762, 3 L.Ed.2d 770 (1959).

 Although the two equitable doctrines are similar in that they prevent a party from asserting inconsistent positions, they can be distinguished by their respective points of focus. While estoppel focuses on the effect of one party's conduct on another, waiver focuses solely on the intent of the party said to have waived its rights. *Saverslak v. Davis–Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980). As a result, the two doctrines "often address different factual settings." *Id.; see, e.g., Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991); *United States Fidelity & Guar. Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 358 (Tex.1971).

 Intent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right. *Saverslak*, 606 F.2d at 213; *see Molten, Allen & Williams, Inc. v. Harris*, 613 F.2d 1176, 1179 (D.C.Cir.1980). In addition, waiver is unilateral in character so that the party asserting it as a defense need not have changed its position for the worse or taken any other action in reliance on the waiver of rights. *Pitts*, 931 F.2d at 357; *Saverslak*, 606 F.2d at 214; *Gonyea v. John Hancock Mut. Life Ins. Co.*, 812 F.Supp. 445, 450 (D.Vt.1993); *Bimco*, 464 S.W.2d at 358.

On the other hand, if one party does change its position for the worse, equitable estoppel may lie against the other party even absent intent to waive a known right. *Saverslak*, 606 F.2d at 213.

**B**

 Assuming that K–Com at one time had the right to enforce the contract against NEDCO, the intent to waive that right in favor of arriving at a consensual agreement can be inferred from the manner in which K–Com conducted itself in negotiating with NEDCO and the SBA. K–Com acquiesced in all NEDCO's demands, including the demands for a new subordination agreement and for a voting trust agreement or equivalent protection. Other than the Nesse letter (assuming it constituted a demand for performance), not once in the parties' year-and-a-half long negotiations did K–Com maintain that NEDCO was under a duty to perform or acting outside its contractual rights. In the meantime, NEDCO rejected the notion that the deal was anywhere near closing, (Def.'s Ex. S, at 3), threatened to "reassess" its interest in investing in K–Com unless the SBA issues were resolved by February 14, 1990, (Def.'s Ex. AA), and in July 1990 transferred responsibility for financing the deal to its affiliate, the Economic Development Finance Corporation (EDFC), a separate legal entity not in privity of contract with K–Com, (Def.'s Ex. LL). Despite these actions on the part of NEDCO, K–Com never once asserted its rights. If K–Com was intent on preserving its rights against NEDCO, it would not have continued negotiating with NEDCO without letting NEDCO know that its acquiescence should not be construed as a waiver or taking some other steps to protect its rights. *Compare Spraying Sys. Co. v. William G. Smart Co.*, 816 F.Supp. 465, 471 (N.D.Ill.1993). K–Com's acquiescence at some point ripened into an intentional relinquishment of the right to NEDCO's performance. *Saverslak*, 606 F.2d at 214; *Central States, Southeast & Southwest Areas Pension Fund v. Ecko Prods., Inc.*, 581 F.Supp. 374, 378 (N.D.Ill.1984).

Moreover, the circumstances in which K–Com chose to negotiate without preserving its rights support a finding of waiver. Throughout the year-and-a-half that K–Com negotiated with NEDCO and the SBA, K–Com's financial position was progressively getting worse. K–Com was in dire need of financing to effectuate its plan of reorganization and to perform its existing contracts. Its equipment was in disrepair, worn out, and to a large extent obsolete. It was operating at a loss and falling in arrears on its taxes and plan payments. It defaulted on existing contracts and was unable to take on new business. It had to close its Richmond, Virginia office. Because of its poor financial condition, in June 1991 the SBA stripped it of its small business set-aside status. (Def.'s Ex. AAA.) Yet, despite ample opportunity for protest, K–Com never demanded performance from NEDCO, never threatened suit, nor did it otherwise assert its rights, not even to remind NEDCO that it was obligated to perform. K–Com's silence on this point until October 1991, when it brought suit, in the face of its steadily worsening financial predicament and eventual ruin is inconsistent with an intent to enforce its rights at a later date. K–Com needed the financing sooner, not later. That K–Com chose to negotiate without once reasserting its rights and despite its dire financial condition, evidences its intent to waive any rights it may have had to demand financing from NEDCO.

In its papers and through Jacobs's testimony at trial, K–Com urges that trying to accommodate NEDCO's wishes was not inconsistent with preserving its contractual rights. What it needed, K–Com suggests, was financing, not a lawsuit.

K–Com's argument has merit, but only up to a point. At some time, as its financial condition progressively deteriorated, K–Com, in the exercise of business judgment, should have demanded performance or threatened suit. The failure to do so gives rise to an inference of waiver. When this inference is considered along with K–Com's complete acquiescence in NEDCO's position and the failure to reserve its rights under the contract (which would not have prevented negotiations but might have moved things along), a finding of waiver is warranted. *Cf. In re Garfinkle*, 672 F.2d 1340, 1348 (11th Cir.1982); *Saverslak*, 606 F.2d at 214; *Pfister v. Cow Gulch Oil Co.*, 189 F.2d 311, 315 (10th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951); *Ecko*, 581 F.Supp. at 378; *Allen & Co. v. Occidental Petroleum Corp.*, 382 F.Supp. 1052, 1063 (S.D.N.Y.1974), *aff'd*, 519 F.2d 788 (2d Cir.1975).

As was explained in *Pfister v. Cow Gulch Oil Co.*—

Silence under such circumstances when, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred. Where a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced.

189 F.2d at 315 (footnote omitted). That is what happened here. From the end of November 1989 until rejection of the contract in July 1991, NEDCO, without any protest from K–Com, maintained a position adverse to the rights and interests of K–Com. In such circumstances, K–Com can only be said to have acquiesced in NEDCO's position thereby waiving its rights to NEDCO's performance.

This case must be distinguished from those cases holding that a previously waived contractual obligation can be revived. *See, e.g., Ottenberg v. Ottenberg*, 194 F.Supp. 98, 104 (D.D.C.1961). But first it must be noted that there is no evidence that K–Com took any steps to revive its rights by a timely rescission of its waiver. *Saverslak*, 606 F.2d at 214 n. 11. Where revival has been allowed, the financial condition of one party did not deteriorate during the period of waiver to such an extent that the performance originally contemplated was no longer economically viable. Nor is this a case where performance was delayed by mutual consent so that both par-

ties retained the right to demand performance of the other. *See In re Independent Distillers of Kentucky,* 34 F.Supp. 708, 712 (W.D.Ky.1940). This case involved a unilateral waiver of rights by K–Com until it was too late for it to be fair to require performance from NEDCO. As such, it falls squarely into the rule that—

> waiver of performance of an obligation, which means permission not to perform it, excuses the obligor from performing so long as the waiver or permission continues, and if the waiver continues so long that performance by the obligor will be essentially different from that which he originally bargained to render, all right to enforce the obligation is lost.

5 Samuel Williston *A Treatise on the Law of Contracts* § 690, at 314 (3d ed. 1961).

### C

■ The court also believes that K–Com should be equitably estopped from asserting its rights against NEDCO, although this is a much closer question than the waiver issue. To establish equitable estoppel, four elements must be shown— "false representation, a purpose to invite action by the person to whom the representation was made, ignorance of the true facts by that party, and reliance." *Hoeber v. District of Columbia Redev. Land Agency,* 483 F.Supp. 1356, 1365 (D.D.C. 1980), *aff'd mem.,* 672 F.2d 894 (D.C.Cir. 1981). The false statement may be inferred from acts or acquiescence. *Garfinkle,* 672 F.2d at 1347; 3 J. Pomeroy, *Equity Jurisprudence* § 808, at 207 (5th ed. 1941) [hereinafter Pomeroy, *Equity* ]. "The party to be estopped must have intended that his assertions be acted upon by the party raising the defense, or must act so that that party could reasonably believe it so intended." *United States v. Exxon Corp.,* 561 F.Supp. 816, 845 (D.D.C.1983), *aff'd,* 773 F.2d 1240 (Temp. Emer.Ct.App.1985), *cert. denied,* 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); *accord* Pomeroy, *Equity* § 811, at 226–27.

■ The first three elements of estoppel are clearly met here. First, K–Com's conduct in not enforcing its contractual rights and in acquiescing in NEDCO's demands amounted to a false statement that K–Com would not enforce its rights against NEDCO. Second, K–Com acted in this manner to induce NEDCO to negotiate in an effort to arrive at a consensual agreement instead of being left with only a lawsuit. Even if K–Com did not intend this effect on NEDCO—a notion which is rejected in the preceding section—it was reasonable for NEDCO to believe that K–Com so intended. Third, NEDCO had no way of knowing that K–Com had any other design in mind. It is the fourth element—that of detrimental reliance—that is somewhat troublesome.

K–Com argues that equitable estoppel cannot lie because NEDCO did not change its position for the worse because of anything K–Com did or did not do. K–Com first notes that NEDCO unilaterally rejected the subordination agreement in December 1989. K–Com then points out that NEDCO, without reference to K–Com's position, remained steadfast in its rejection of the subordination agreement throughout the following year-and-a-half of negotiations.

The court believes NEDCO has been prejudiced sufficiently to warrant a finding of detrimental reliance. The main prejudice to NEDCO was being deprived of the opportunity to decide whether to perform or defend a lawsuit. *Cf. Ecko,* 581 F.Supp. at 379. By negotiating with NEDCO without any indication that it intended to enforce its contractual rights, K–Com lulled NEDCO into a false sense of security that it would not enforce those rights against NEDCO. *See Saverslak,* 606 F.2d at 213, 214; *cf. Church v. Bobbs–Merrill Co.,* 272 F.2d 212, 215 (7th Cir.1959). In the meantime, K–Com's financial condition deteriorated to such an extent that it was no longer a viable investment opportunity. As a result, NEDCO, as a simple matter of business sense, had no choice but to reject the contract. Thus, K–Com, by its conduct, effectively deprived NEDCO of a valuable right, the chance to decide whether to perform.

K–Com insists that under no circumstances would NEDCO have accepted the subordination agreement. However, this is not clear. But more importantly, by showing a desire to negotiate and not to enforce its contractual rights, K–Com induced NEDCO into refraining from taking steps to protect its interests. The point here is not that NEDCO would have performed had K–Com demanded performance, but that NEDCO never had the opportunity to decide whether to perform.

In addition, prompt resolution of the dispute over the adequacy of the subordination agreement would have greatly benefitted NEDCO by saving it the transaction costs associated with a-year-and-a-half of negotiations. *See Garfinkle*, 672 F.2d at 1347; *Saverslak*, 606 F.2d at 214. Based on K–Com's willingness to negotiate until a consensual agreement could be reached, NEDCO expended considerable time, effort, and expense in an attempt to realize consensus. Absent K–Com's misleading conduct, these resources could have been put to a better use, for example, negotiating with another potential borrower.

### III

Finally, K–Com attempts to demonstrate that NEDCO was responsible for the parties' deal falling through. First, K–Com argues that it was not the parties' inability to obtain a subordination agreement acceptable to NEDCO that caused the failure to close their deal, but rather NEDCO's insistence on the creation of a voting trust giving it the ability to control K–Com if K–Com defaulted under the oral contract. (This provision was unacceptable to the SBA because it would eliminate K–Com's eligibility for small business set-aside contracts.) Second, K–Com avers that the subordination agreement NEDCO wanted executed was different only in form from the one the SBA had executed in November 1989. Therefore, K–Com reasons, NEDCO's demands were unfounded and unreasonable, and accordingly, NEDCO should be held in breach.

Assuming that NEDCO did cause the deal to fail, at some point K–Com had the obligation to demand performance or at least to let NEDCO know that its demands were unreasonable, outside the scope of the contract, and must be withdrawn. If NEDCO persisted in its demands, K–Com could then declare breach. At the very least K–Com should have taken steps to preserve its rights while negotiating with NEDCO and the SBA. But K–Com could not go along with NEDCO's demands while in the meantime letting its financial position deteriorate to such an extent that to invest in it would be sheer folly. It must be kept in mind that this was an oral contract whose material terms were spelled only in the vaguest manner. Absent some notice from K–Com, NEDCO had no way of knowing that its demands or failure to perform amounted to breach. Based on K–Com's conduct, it was perfectly reasonable for NEDCO to believe that it was acting well within its right, recognized by K–Com, to protect its investment.

For purposes of this decision, it is assumed that the subordination agreement satisfied the condition precedent and that on execution of the subordination agreement by the SBA K–Com had every right to NEDCO's performance. Thus, this is not a case like *R.A. Weaver & Assocs., Inc. v. Haas & Haynie Corp.*, 663 F.2d 168 (D.C.Cir.1980), where one party points to the failure of a condition precedent as excusing performance. Nor is it a case like *V'Soske v. Barwick*, 404 F.2d 495 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), where one party argues that a contract never existed because the parties never agreed on important terms. What is crucial here is that K–Com failed to press its belief that the subordination agreement fulfilled the condition precedent or to let NEDCO know that its extra-contractual demands constituted breach of contract. This failure meant that K–Com never gave effect to its contractual right to performance.

In any event, the evidence at trial is at odds with the factual basis for K–Com's arguments. It demonstrates that both parties worked hard together to accommodate each other's needs. In fact in correspon-

dence beginning as early as December 1989, (*see* Def.'s Exs. P, S), NEDCO showed a willingness to structure the deal to accommodate the SBA's concerns. The real spoiler was the SBA who balked at every opportunity for moving the deal forward. This is made apparent by the withdrawal in July 1990 of the demand for a voting trust. Notwithstanding this withdrawal, the SBA refused to approve the parties' deal. In these circumstances, the parties can only be said to have agreed mutually to defer contract performance but unfortunately waited until it was too late (because of K–Com's deteriorated financial condition).

After negotiating with K–Com and the SBA for over a year, NEDCO ultimately rejected the contract because with the passage of time K–Com's ability to perform had become almost non-existent. The court held, and reaffirms, that in light of K–Com's deterioration NEDCO's rejection was well within its rights.

### CONCLUSION

Based on the foregoing, it is

ORDERED that K–Com's motion for amendment of judgment or for new trial is denied.