**Thomas A. MOTTO, Jr., Plaintiff,**

**v.**

**The GENERAL SERVICES ADMINISTRATION of the United States of America, Robert Hampton, James E. Johnson, and L. J. Andolsek, Individually and as Chairman and Members of the United States Civil Service Commission, and Robert L. Kunzig, Individually and as Administrator of the General Services Administration of the United States, Defendants.**

**Civ. A. No. 70–1865.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 28, 1971.

Neal D. Hobson, New Orleans, La., for plaintiff.

Don M. Richard, Asst. U. S. Atty., for defendants.

RUBIN, District Judge:

Mr. Thomas A. Motto was a civil service employee who was employed by the U. S. Government for nine years. He lived and worked in New Orleans, and was earning $8,243 annually. In 1967, he was notified that he was being reassigned to Fort Worth at the same sala-

ry. Motto contends that this was an adverse action and that he was entitled to a hearing under 5 U.S.C. Sec. 7512.[1] He alleges that his supervisor then wrongfully threatened him with disciplinary action if he failed to report promptly as ordered, but gave him a choice of retiring in order to avoid this action. This, he contends, coerced him to submit an application for retirement. Three years and five months later, Motto filed this suit for reinstatement. The government promptly moved to dismiss it for laches.[2]

When he was notified of the impending transfer, Motto sought a hearing through Civil Service Appeals channels. On February 13, 1967, the day he was required to report to Fort Worth, Motto contends his supervisor told him he would be subjected to disciplinary action if he did not report to his new station. The supervisor, he says, told him he could avoid this only by early retirement. He was later notified that his retirement application must be received in writing by February 22. The Civil Service Appeals examiner notified him on February 23 that his reassignment could not be reviewed because it was not considered adverse action. The same day he submitted his retirement forms. Meanwhile he filed an appeal from the Examiner's decision to the Civil Service Commission's Board of Appeal and Review, and he also sought administrative relief from the Administrator of GSA. On March 20 administrative relief was denied because of his retirement. On April 3 the Board of Appeal and Review refused to consider his appeal because Motto had "elected to retire."

Motto then set out to protest in every way conceivable to him. On July 9, he wrote the President. Pursuant to a suggestion received in the reply to his letter to the President, he wrote the Regional Administrator of the General Services Administration on November 30. The Regional Administrator advised him on December 12 that GSA would not reconsider. He consulted four different lawyers, the first on March 26, 1968. Each one either refused to take the case or advised him, in effect, to seek relief through political channels. He unsuccessfully applied for help from the Equal Employment Opportunities Commission in August, 1968. He sought aid from the National Alliance of Postal and Federal Employees in November, 1968. He importuned his Congressman on December 12, 1968 and again on February 4, 1969. He consulted two more lawyers and the ACLU. Each refused to take his case.

On March 11, 1969 he wrote the Clerk of the U.S. Court of Claims for advice. In 1969, he also went to see another lawyer, who said he was inexperienced in such matters and refused the case. In October 1969, he requested consideration from GSA, and wrote the National Association of Government Employees. GSA rejected his request in January 1970. In March, Motto sought out the United States Civil Rights Officer, and in April he tried the Civil Service Commission Complaint Office—all to no avail. Finally he consulted his present counsel who agreed to handle his case on a contingent fee basis.

One thing is certain: Motto has never had a hearing on the merits of his contention by anyone. He has never had a chance to present testimony to GSA, to the Civil Service Commission, or to any court. If he has delayed reaching the courthouse so long that he cannot get a hearing here, he is foreclosed from relief.

United States ex rel. Arant v. Lane, 1919, 249 U.S. 367, 39 S.Ct. 293, 63 L. Ed. 650, is the leading case on the sub-

---

1. Section 7512 does not in terms give a right to a hearing and this recitation of Mr. Motto's position is not a determination of his rights under the statute. The only question before the court at this time is the matter to dismiss for laches.

2. It was filed within the six year statute of limitations for actions against the United States. 28 USC Sec. 2401.

ject of laches in presenting claims against the United States. Arant had delayed 20 months in suing the U.S. It does not appear from the opinion what he did in the meanwhile and the court affirmed the dismissal of the suit, saying:

> Under circumstances which rendered his return to the service impossible, except under the order of a court, the relator did nothing to effectively assert his claim for reinstatement to office for almost two years. Such a long delay must necessarily result in changes in the branch of the service to which he was attached and in such an accumulation of unearned salary that, when unexplained, the manifest inequity which would result from reinstating him, renders the application of the doctrine of laches to his case peculiarly appropriate in the interests of justice and sound public policy. 249 U.S. at 372, 39 S.Ct. at 294.

But it is apparent that in determining whether the passage of time amounts to laches, the actions taken by the claimant during the elapsed period must be considered. For, to establish the defense of laches, the evidence must show both that the delay was unreasonable and that it prejudiced the defendant. Pfister v. Cow Gulch Oil Co., 10 Cir. 1951, 189 F.2d 311, cert. den. 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665. Thus, the Supreme Court in Nicholas v. United States, 1921, 257 U.S. 71, 76, 42 S.Ct. 7, 9, 66 L.Ed.2d 133, said:

> * * * The findings in this case disclose that plaintiff took no steps to question the order dismissing him from the service, nor to ask for a copy of the charges upon which he was removed. He did nothing for his vindication until he brought this suit 3 years after his removal from the office, to recover compensation.

Again, in Norris v. United States, 1921, 257 U.S. 77, 80, 42 S.Ct. 9, 11, 66 L.Ed. 136, the court said with reference to a claim of laches:

He did not, as did Wickersham (United States v. Wickersham, 201 U.S. 390, 26 S.Ct. 469, 50 L.Ed. 798), promptly demand a restoration to the office, nor make any claim to its emoluments because the power of removal had been exercised without giving him the opportunity for a hearing which the statute affords. Each case must be decided upon its own facts, and we are of opinion that the findings here do not disclose that exercise of reasonable diligence on Norris' part which the law imposes upon him as a duty if he would recover compensation for services in an office which the government might fill with another, or otherwise adjust its service so as to dispense with the service of the plaintiff. Public policy requires reasonable diligence upon the plaintiff's part, which we think the findings in this record do not disclose.

In all these cases the defense was maintained because the plaintiff failed to show reasonable diligence, not merely because he had failed to sue in any particular time. A host of later cases have followed a similar rationale in dismissing suits brought late without reasonable explanation for the delay. See Chappelle v. Sharp, 1961, 112 U.S. App.D.C. 182, 301 F.2d 506, cert. den. 370 U.S. 903, 82 S.Ct. 1250, 8 L.Ed.2d 400 and cases cited therein and Chiriaco v. United States, 5 Cir. 1964, 339 F.2d 588 and cases cited therein. Here, Motto made his claim known to the government in as many ways as he could conceive and as persistently as anyone could expect. He did everything but plead in proper person. He tried repeatedly to get legal help. He improtuned every government official imaginable. Judge Wright has summed up all the reasons why a poor person who cannot get a lawyer should not be barred access to the courts because of the delay while he is seeking help. He importuned every government help. Powell v. Zuckert, 1966, 125 U.S. App.D.C. 55, 366 F.2d 634. I will not quote briefly from that masterful opinion, for its deserves to be read in its en-

tirety. As he there points out, poor people, even today with the benefit of Legal Aid, O.E.O., and the efforts of the organized bar, still have trouble getting counsel. Motto, a person of modest means, was in a worse situation in some ways. He was a white collar worker, a clerk, with a modest income and a family to support. He is not eligible for legal aid or services to the indigent; he isn't poor enough to appeal to sympathy and he can't get charity even if he humbles himself to ask for it. O.E.O. regulations would preclude acceptance of his case in the normal course because it is capable of generating a contingent fee.[3] The fee a competent practicing lawyer would charge on a non-contingent basis for effective representation against the biggest litigant in the world is more than his means permit. He sought at length for a lawyer willing to take on a time consuming, difficult case against a tough adversary on a contingent fee or out of a sense of professional responsibility. He finally found one. I don't think it was too late.

Laches is said in an old legal saw to be a penalty for sleeping on one's rights. If ever a man did not sleep on his, it was Motto. Indeed, he has had three years of legal insomnia. The motion to dismiss is therefore denied.

---

3. See, e. g. the Office of Economic Opportunity's Guidelines for Legal Services p. 20.