**NORTEL NETWORKS, INC., Plaintiff,**

v.

**GOLD & APPEL TRANSFER, S.A., Defendant.**

**No. CIV.A. 02–0706(JDB).**

United States District Court, District of Columbia.

Jan. 5, 2004.

## *MEMORANDUM OPINION*

BATES, District Judge.

In this diversity of citizenship action brought pursuant to 28 U.S.C. § 1332, plaintiff Nortel Networks ("Nortel") claims that defendant Gold & Appel Transfer ("G & A") failed to abide by two letter agreements that obliged it to provide $35 million in loans to NETtel Communications ("NETtel"). Nortel was the administrative agent for a syndicate of lenders (the "Syndicate") that purchased NETtel securities and made short-term loans to NETtel on the condition that a portion of the G & A financing would be used by NETtel to repay the Syndicate's loans. Presently before the Court are the parties' cross-motions for partial summary judgment. Nortel moves for summary judgment solely on Count II of its complaint, which alleges breach of the second letter agreement, dated July 17, 2000. G & A moves for summary judgment on Count I of Nortel's complaint, which alleges breach of the earlier letter agreement, dated April 13, 2000, as well as on Count II.

The pending motions present three issues. The first is whether a written notice requirement that appears in both letter agreements was a material condition precedent to G & A's performance under the agreements. The second is whether G &

A's course of conduct between July and November of 2000 operated as a waiver of that provision, excusing NETtel's failure to make a written request for funds. And the third, relevant only to G & A's motion, is whether Nortel was an intended third-party beneficiary of the April agreement.[1] The parties' briefs and arguments at a hearing on these cross-motions focused on these issues, and the Court agrees that the motions may be decided upon their resolution.[2] The Court concludes that Nortel's provision of notice was not a material condition precedent to G & A's performance under the July agreement. G & A has failed to rebut Nortel's contention that G & A waived the written notice requirement. Nortel is thus entitled to summary judgment on Count II of its complaint. As for G & A's motion, the Court finds that a genuine issue of material fact exists as to whether the members of the Syndicate were intended third-party beneficiaries of the April agreement. Summary judgment on Count I of Nortel's complaint will therefore be denied at this time.

## I. BACKGROUND

Nortel is a large, publicly-traded Canadian corporation that provides network services and infrastructure in over 150 countries. G & A is a British Virgin Islands fund that invests in and makes loans to companies in the telecommunications field. Deposition of Walt Anderson ("Anderson Dep.") at 23. It is wholly owned by Iceberg Transport, S.A., a Panamanian company, id. at 7, and managed by Walt Anderson, id. at 10. NETtel was a Washington D.C.-based local telecommunications carrier. It built a network spanning 9,000 miles and thirteen U.S. cities before filing for bankruptcy in September 2000. It ultimately liquidated its assets later that year. Prior to the agreements that are the subject of this dispute, and pursuant to a credit agreement dated July 28, 1999, the Syndicate made a secured loan to NETtel of approximately $130 million for the purchase of network equipment. Affidavit of Scott Binder ("Binder Aff.") ¶ 4. G & A had by then become NETtel's largest single shareholder, having made an equity investment of more than $30 million. Anderson was made a director of NETtel following G & A's investment, and moved G & A into office space at NETtel headquarters.

By April 2000, NETtel's outside accountants had begun to question its viability as a going concern. Anderson Dep. at 109–10. Afraid that the accountants would render a qualified opinion as to the company's finances and thus jeopardize its ability to make an initial public offering, NETtel CEO James Kenefick approached Anderson for additional funding. According to Anderson, the accountants had agreed that if G & A made a standby commitment of $35 million to NETtel, they would not issue a letter questioning NETtel's ability to meet its obligations as they became due.[3] Id. at 112. Accordingly, on

---

1. The July letter agreement expressly provides that it is "for the benefit of and may be enforced by" Nortel and the other members of the Syndicate. Def.'s Cr. Mot. and Opp., Ex. E.

2. G & A does not dispute that it did not fund the amount specified in the July agreement. Def.'s Cr. Mot. and Opp. at 6–7. Instead, G & A maintains that "[n]o obligation ever arose that required G & A to advance any funds to

Net-tel under the April 2000 Letter or the July 2000 Letter," id. at 2, because "Net-tel never made any written request that G & A advance funds under the July 2000 Letter," id. at 4.

3. Anderson maintains that Kenefick "indicated he didn't believe that the standby loan would ever be necessary, but that the accountants wanted to have it there for their comfort." Anderson Dep. at 112. Nortel concedes that Kenefick did not originally in-

April 13, 2000, G & A agreed to provide subordinated financing to NETtel in the principal amount of up to $35 million. Def.'s Cr. Mot. Ex. A. G & A agreed to provide the financing either on July 5, 2000, or between that date and the date of any initial public offering of NETtel shares. The agreement also stipulated that G & A would "advance funds hereunder upon at least fifteen (15) business' [sic] days prior written request from [NETtel]." *Id.* It contains no mention of Nortel or any other members of the Syndicate.

In the following months, NETtel decided to forego its plans for an initial public offering and to explore other means of raising long-term capital. Kenefick Dep. at 98–99. More immediately, by July 2000, NETtel needed funds to meet its operating expenses. *Id.* at 129–30. Kenefick approached Anderson to arrange a loan from G & A. According to Kenefick, Anderson said that G & A would be unable to make any more capital available to NETtel before September 15, 2000, but that it would have at least some money available for NETtel thereafter. *Id.* at 102–05. Unable to wait that long, NETtel requested short-term loans and equity investments totalling about $20 million from members of the Syndicate to bridge NETtel's working capital needs until September. The lenders agreed on the express condition that their bridge loans would be

repaid from the proceeds of the financing that G & A would be able to provide after September 15, 2000.[4] Binder Aff. ¶ 7, Exs. A and B. By a letter agreement dated July 17, 2000, G & A agreed to provide subordinated financing to NETtel in the principal amount of up to $35 million upon the terms and conditions set forth in a promissory note issued on that date. Def.'s Cr. Mot. Ex. E. The G & A financing was to be provided on or before September 15, 2000, and was to have a maturity date of the earlier of July 5, 2001, or the date of any initial public offering of NETtel shares. Like the April agreement, the July agreement provided that G & A would "advance funds hereunder upon at least fifteen (15) business' [sic] days prior written request from [NETtel]." *Id.* But unlike the April agreement, the July agreement provided that, to the extent of $20 million, it and the accompanying promissory note were for the benefit of and were enforceable by Nortel and any other members of the Syndicate. *Id.*

Notwithstanding G & A's alleged inability to provide financing until September 2000, G & A loaned NETtel $13.8 million that summer: a traunche of $1.8 million in July and another $12 million sometime in August. Anderson Dep. at 162. G & A denies that this new funding was made pursuant to any outstanding agreement with or legal obligation to NETtel.[5] Def.'s

---

tend that the loan contemplated by G & A and NETtel in April would ever be funded. Pl.'s Rep. at 12–13; Deposition of James Kenefick ("Kenefick Dep.") at 121. But Kenefick maintains that he subsequently requested funds pursuant to the April agreement and under the subjective understanding that the April agreement was a binding loan. Kenefick Dep. at 63, 84–85, 103, 105.

4. The bridge loans were made pursuant to amendments to the original credit agreement between the Syndicate and NETtel. *See* Binder Aff. Ex. A, Ex. B. The amendments specified that the bridge loans were to be

repaid by November 15, 2000. *Id.* ¶ 10. As a condition precedent to the effectiveness of these amendments, G & A was, by July 31, 2000, to have "executed and delivered to [NETtel and Nortel] a written commitment, in form and substance satisfactory to [Nortel], to provide the Gold & Appel Financing on or before September 15, 2000." *Id.* Ex. A., § 3(a)(iii); Ex. B., § 4(a)(iii).

5. On this issue, Anderson equivocates. He claims to have believed that "no request was made for these loans and we were not required to loan money to [NETtel]," but also that "the conditions of the loan could be

Rep. at 8. Rather, G & A claims to have acted pursuant to Kenefick's "personal appeal to try to save" NETtel, Anderson Dep. at 156, and in the hope that "with that money and a little bit of time and negotiations with creditors the company could be saved from bankruptcy."[6] *Id.* at 166. NETtel did not make and G & A did not demand any written request for these funds. Instead, "the relationship had always been [that] whenever [NETtel] needed money," the funds were advanced pursuant to a conversation between Kenefick and Anderson. Deposition of Craig Bandes ("Bandes Dep.") at 45, 55–56, 67–68 ("[I]t was just the practice, the way it had been established from the beginning, that Jim [Kenefick] would just ask Walt [Anderson] for the money and it would come in. We had just never done a written request before."); *see also* Kenefick Dep. 169–70.

The bridge loans failed to satisfy NETtel's capital needs, and G & A provided no further funding on or before September 15, 2000. On September 28, 2000, in the presence and with the approval of the Syndicate's representatives, Bandes Dep. 103–04, NETtel filed a voluntary petition for relief under the Bankruptcy Code. NETtel's hard assets were subsequently liquidated. Proceeds of the liquidation satisfied a portion of the Syndicate's loans made to NETtel in the summer of 2000,

but only because those loans had been written to subordinate prior secured loans from the Syndicate. Thus, Nortel asserts that G & A's failure to provide $20 million pursuant to the July agreement resulted in a $20 million loss. This action was filed on April 12, 2002.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to

handled under that initial loan commitment since we already had an agreement in place." Anderson Dep. at 163–64. Asked directly if the money was "funded pursuant to your 35 million dollar commitment," Anderson replies "I believe it ended up being construed as that. I'm not sure that that really is a correct representation." *Id.* at 168. But he goes on to say, when asked if any other instrument memorialized the $13.8 million loans of the summer, that no such instrument was deemed necessary because "[a]t the time we simply put the money in and assumed that it would be covered under the terms of the 35 million dollar agreement. We were voluntarily

choosing to put the money in under those conditions." *Id.*

6. Although G & A makes no specific allegation of fraud, Anderson claims that he had not "heard all the bad news" when G & A elected to make these loans. *Id.* at 166. He claims to have initially believed that G & A's obligation to provide NETtel $35 million (presumably pursuant to the July agreement) had been excused because G & A had received materially false information before advancing the $13.8 million. *Id.* at 167.

preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]," *Id.* at 252, 106 S.Ct. 2505, but it is not available if material facts remain at issue or are susceptible to divergent inferences. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994).

### B. Materiality of the Written Request Provision

G & A insists that any obligation it may have had to advance funds to NETtel under the letter agreements was conditioned upon NETtel's prior written request of at least fifteen business days. *See* Def.'s Cr. Mot. and Opp. at 2, 8. G & A explains that, had NETtel made a written request for funds pursuant to the letter agreements, it would have needed time to obtain those funds by borrowing against forthcoming transactions. Def.'s Rep. and Opp. at 5. Nortel does not dispute that the written request provision was a condition precedent to G & A's performance; rather, it maintains that the condition was merely procedural and thus that its failure to occur may be excused because its enforcement would result in a disproportionate forfeiture. Pl.'s Rep. and Opp. at 9.

■ A condition precedent may be defined as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." RESTATEMENT (SECOND) OF CONTRACTS § 224; *see also Washington Props. v. Chin*, 760 A.2d 546, 549 (D.C.2000).[7] "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its condition was a material part of the agreed exchange." RESTATEMENT (SECOND) OF CONTRACTS § 229. Typical of conditions that may be immaterial are "those which may be thought of as procedural or technical, or ... conditions which merely relate to the time or manner of the return performance or provide for the giving of notice or the supplying of proofs." RESTATEMENT (SECOND) OF CONTRACTS § 84 cmt. d. "In determining whether a forfeiture is 'disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance

---

**7.** In this diversity case, because there has been no agreement or argument by the parties to the contrary, it is proper for the Court to apply District of Columbia choice of law principles and substantive rules of decision. *Lee v. Flintkote*, 593 F.2d 1275, 1279 n. 14 (D.C.Cir.1979); *Mariner Water Renaturalizer of Washington v. Aqua Purification Sys.*, 665 F.2d 1066, 1069 n. 3 (D.C.Cir.1981). The letter agreements contain no choice of law provision, although the original credit agreement between NETtel and the Syndicate and the amendments thereto provide that they are to be governed by New York law. But "at no time during the course of this litigation have the parties briefed the choice of law question. Nor have they ... relied upon the law of New York or of any other jurisdiction in particular as the sole source of controlling precedent." *Lee*, 593 F.2d at 1279. Thus, the law of the District of Columbia governs this dispute.

to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture." RESTATEMENT (SECOND) OF CONTRACTS § 229 cmt. b. Furthermore, "it is well settled that nonoccurrence of a condition precedent to a promissor's performance is normally excused when fairly attributable to the promissor's own conduct." *R.A. Weaver and Assoc. v. Haas and Haynie Corp.*, 663 F.2d 168, 176 (D.C.Cir. 1980).

■ Here, the prior written request provision does not appear to have been especially important to the agreement between NETtel and G & A. It is conceivable that, as G & A argues, it sought to protect itself from the risk of a sudden demand for funds by inserting the provision into the two letter agreements. But it is unclear that G & A suffered any harm because of NETtel's substitution of oral for written notice. *See Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016, 1018 (5th Cir.1995). G & A has not alleged that NETtel's repeated oral requests for funds were untimely, nor has G & A supplied any reason for the preferability of written notice with regard to its stated objective for including the request provision. Moreover, at the hearing on the parties' motions, counsel for G & A conceded that G & A did not demand prior written notice for the two loans totaling $13.8 million made by G & A to NETtel in the summer of 2000. Tr. of Mot. Hearing, November 21, 2003 ("Tr."), at 34. Even assuming for the moment that these funds were not supplied pursuant to one or both of the letter agreements, the Court fails to see why G & A would insist on written notice for advances pursuant to the letter agreements and not, as G & A puts it, for those made in response to Kenefick's "personal appeal to try to save" NETtel. Anderson Dep. at 156.

Weighed against the $20 million loss at stake for Nortel, and given the clear intent of the parties as it is appears from the July agreement, the Court concludes that insisting upon the written request provision would result in a disproportionate forfeiture as provided under the Restatement. Since G & A's stated purpose of requiring a prior written request from NETtel was to give it adequate time to muster the necessary liquidity to meet its commitment under the July agreement, and since that purpose had been served by NETtel's oral requests, the Court may excuse the non-occurrence of the condition to the extent required to allow recovery by Nortel. *See Delaware Steel Co. v. Calamar Steamship Corp.*, 378 F.2d 386, 388–89 (3d Cir.1967). G & A's own conduct in extending funds to NETtel without the formalities contemplated in the July agreement provides a basis for excusing the written request provision. *See R.A. Weaver*, 663 F.2d at 176.

## C. Waiver

More importantly, the Court finds that G & A excused the non-occurrence of the condition imposed by the prior written request provision by engaging in a course of conduct that amounted to waiver. In opposition to Nortel's motion, G & A argues that the Court should not look to extrinsic evidence of the parties' subjective intent or course of performance because the July agreement is unambiguous on its face. *See* Def.'s Cr. Mot. and Opp. at 5; *N.P.P. Contractors, Inc. v. John Canning & Co.*, 715 A.2d 139, 142 (D.C.1998); *Potomac Elec. Power Co. v. Mirant Corp.*, 251 F.Supp.2d 144, 150 (D.D.C.2003). Nortel replies that the Court may look to conduct inconsistent with an intent to enforce a contract right in determining if there has been waiver. *See* Pl.'s Rep. and Opp. at 8;

*In re K–Com Micrographics, Inc. v. Neighborhood Economic Dev. Corp.*, 159 B.R. 61, 67 (Bkrtcy.D.D.C.1993). Having basically conceded that point at the motions hearing, Tr. at 32–33, G & A emphasizes that the determination of whether it "waived any rights is an issue of material fact that can only be determined by the trier of fact. Therefore, for this reason alone, any claim of waiver by Nortel would preclude Nortel from obtaining summary judgment." Def.'s Rep. and Opp. at 7.

■ Waiver is "an intentional relinquishment or abandonment of a known right or privilege." *United States v. Robinson*, 459 F.2d 1164, 1168 (D.C.Cir.1972) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). It is an equitable principle designed to "avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair. It serves to prevent a party from insisting on a right upon which he could have insisted earlier but has found to have surrendered." *In re K–Com Micrographics, Inc.* 159 B.R. at 66–67 (quoting *L. Orlik Ltd. v. Helme Prods. Inc*, 427 F.Supp. 771, 776 (S.D.N.Y. 1977)). Intent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right. *Id.* at 67 (citing *Pitts v. Amer. Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991)). To preserve a right to notice, a party may question the sufficiency of the notice it has received or otherwise indicate its belief that the party obligated to give notice has in some way been deficient. *See FDIC v. Interdonato*, 988 F.Supp. 1, 10–11 (D.D.C. 1997).

■ Whether waiver has occurred is typically a question for the trier of fact. *See Safer v. Perper*, 569 F.2d 87, 99 (D.C.Cir.1977); *Radiation Systems, Inc. v. Amplicon, Inc.*, 882 F.Supp. 1101, 1105 (D.D.C.1995); *Britamco Underwriters, Inc. v. Nishi, Papagjika & Assoc., Inc.*, 20 F.Supp.2d 73, 77 (D.D.C.1998) (a finding of waiver "turns on the intent of the party ostensibly waiving the right, a state of mind which must be culled from the specific facts and circumstances surrounding the purported relinquishment"); *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F.Supp.2d 60, 65 (D.D.C. 2001). However, whether undisputed or clearly established facts constitute waiver may, like countless other factual issues posed in litigation, be a question appropriate for summary resolution. *See Word v. Ham*, 495 A.2d 748, 751 (D.C.1985); *Home Indemnity Co. of New York v. Allen*, 190 F.2d 490, 491–92 (7th Cir.1951); *Great Am. Ins. Co. v. M/V Handy Laker*, 2002 WL 32191640, *7, 2002 U.S. Dist. LEXIS 26378, *27 (S.D.N.Y. Dec. 19, 2002); *Maneikis v. St. Paul Ins. Co.*, 1980 U.S. Dist. LEXIS 12925, *19 (N.D.Ill. May 23, 1980).

It cannot be that, as G & A argues, any claim of waiver by Nortel would preclude summary judgment. Were that the case, any party with a merely colorable allegation of waiver unsupported by the facts would be entitled to a trial; conversely, a clear case of waiver based on facts as to which there was no genuine issue would also have to go to trial. In short, waiver would never be appropriate for summary resolution. The cases do not sustain those propositions. *See, e.g., LoPresti & Sons v. General Car & Truck Leasing Sys., Inc.*, 79 Fed.Appx. 764, 769, 2003 U.S.App. LEXIS 22126, *12 (6th Cir. Oct. 27, 2003) (affirming district court's conclusion at summary judgment that contract rights had not been waived); *Poundstone v. DEW Res. Inc.*, 75 Fed.Appx. 353, 368–69, 2003 U.S.App. LEXIS 18471, *42 (6th Cir. Sept. 3, 2003) (same); *Marley Cooling Tower Co. v. Caldwell Energy & Envtl., Inc.*, 280 F.Supp.2d 651, 659–60 (W.D.Ky.

2003) (finding at summary judgment that a contract party's actions did not constitute waiver). The status of waiver as a question for the trier of fact does not in and of itself bar summary judgment; the correct inquiry is whether the allegation of waiver raises any genuine issues of material fact requiring trial.

█ In this case, it is clear beyond any genuine dispute that G & A's actions constitute waiver of the prior written request provision in the July agreement. G & A offers no response to Nortel's contention that the practice that had developed between the parties was plainly inconsistent with the July agreement's requirement of written notice, nor does G & A suggest that it ever objected to NETtel's failure to make a prior written request for funds under the agreement. Instead, G & A asserts that its payments to NETtel in the summer of 2000 were not made pursuant to any commitment between the two parties. The Court finds that assertion to lack the evidentiary support needed to raise a genuine issue of material fact. Anderson's deposition testimony itself gives the lie to the doubtful proposition that G & A would extend a multimillion-dollar loan to NETtel without documentation and pursuant to nothing but a personal appeal. "[W]e simply put the money in and assumed that it would be covered under the terms of the 35 million dollar agreement. We were voluntarily choosing to put the money in under those conditions." Anderson Dep. at 168. It is true that elsewhere in his remarks Anderson is adamant in denying that G & A was legally required to provide NETtel with funds under the July agreement. *See id.* at 158. But there is no evidence that G & A communicated this position to NETtel in the summer of 2000, or that the argument dates to any time before the start of this litigation.

Indeed, the Court perceives no evidence that G & A sought to preserve its right to prior written notice when NETtel requested funds pursuant to the July agreement. G & A's two extensions of funds in the summer of 2000 without any objection as to the absence of written notice constitute a clear waiver of the provision on which it now insists. *See In re K–Com Micrographics, Inc.* 159 B.R. at 66–67; *cf. Interdonato,* 988 F.Supp. at 10 (to preserve its notice argument, garnishee should have indicated its belief that there were deficiencies in the notice provided by claimant under an insurance contract); *FDIC v. Burdette,* 718 F.Supp. 649, 653 (E.D.Tenn. 1989) ("If the notice provided to an insurer is considered by the insurer to be defective, good faith requires the insurer to notify the insured of its objections within a reasonable time, and if the insurer fails to do so or proceeds to act as though notice was satisfactory, it has waived any right to assert notice as a defense at a later date."). The Court finds that there is no genuine issue of material fact as to whether G & A waived its right to a prior written request for funds. The failure to comply with that provision of the July agreement was not, accordingly, a failure to comply with a condition precedent to G & A's performance. Summary judgment in favor of Nortel on Count II of the complaint is therefore warranted: Nortel may enforce its rights as a named beneficiary of the July agreement between NETtel and G & A.

## D. The April agreement

█ Nortel's status as a beneficiary of the July agreement is established by a specific provision of that agreement. On the other hand, Nortel's status as an intended third-party beneficiary of the April agreement is not set out in that agreement and remains unclear based on the facts as they now stand. A third-party beneficiary

need not be named in a contract to have rights pursuant to it. *See R.A. Weaver,* 663 F.2d at 175. However, the parties to a contract must "directly and unequivocally intend to benefit a third party in order for that third party to be considered an intended beneficiary." *Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp.,* 886 F.Supp. 874, 879 (D.D.C.1995). A mere awareness that a third party may derive a benefit from a promissor's performance under a contract is insufficient to elevate the third party to the status of an intended beneficiary. *See id.* at 880.

In its briefing, G & A insists that the members of the Syndicate were not intended to have any rights under the April agreement, Def.'s Cr. Mot. and Opp. at 3, 7, and Kenefick concurs that the agreement was not for their benefit. Kenefick Dep. at 61–62, 85. Nortel, on the other hand, points to the testimony of Thomas Aiken, a former vice president for Syndicate member Allied Capital Corporation, who claims that the Syndicate made a $10 million equity investment in NETtel on the condition that NETtel obtain the $35 million loan commitment contemplated by the April agreement. Pl.'s Rep. and Opp., Ex. G, ¶¶ 6–8. He says that a goal of the April agreement was to ensure "that the lenders would have some assurance, in the form of the commitment letter from G & A, that they would see positive returns on their investment in NETtel." *Id.* at ¶ 8. Nortel contends that, as equity investors in this $10 million round, the Syndicate was an intended beneficiary of the assurance provided by the April agreement. Pl.'s Rep and Opp. at 15. It therefore appears that the parties' conflicting views on the third-party beneficiary issue are each supported by some evidence in the record.

Whether Nortel and the other Syndicate members were unnamed intended benefi-

ciaries of the April agreement is thus a fact in genuine dispute that would be material to determining whether Nortel had any rights to enforce pursuant to that agreement. Summary judgment is inappropriate on Count I of Nortel's complaint at this time given that genuine issue of material fact.

## CONCLUSION

Nortel's motion for partial summary judgment as to Count II of its complaint will be granted, because no genuine issue of material fact exists as to G & A's waiver of the prior written request provision in the July agreement. However, because at this juncture the Court cannot conclude that Nortel was not an intended beneficiary of the April agreement, G & A's cross-motion for partial summary judgment on Count I will be denied. A separate order has been issued on this date.

## ORDER

Upon consideration of plaintiff's motion for partial summary judgment, defendant's cross-motion for partial summary judgment, and the entire record, it is hereby

ORDERED that plaintiff's motion is GRANTED; and it is further

ORDERED that defendant's cross-motion is DENIED; and it is further

ORDERED that judgment shall be entered for Nortel on Count II of its complaint.