*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 16-CV-1235

SJ ENTERPRISES, LLC, APPELLANT,

v.

DIANNE QUANDER, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CAB-3221-16)

(Hon. Steven M. Wellner, Trial Judge)

(Argued March 29, 2018                    Decided May 16, 2019)

*Stephen O. Hessler* for appellant.

*Aaron Sokolow*, with whom *Morris R. Battino* and *Vivianette Velázquez* were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN, *Associate Judge*, and FERREN, *Senior Judge*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Opinion concurring in the judgment by *Senior Judge* FERREN, at page 18.

BLACKBURNE-RIGSBY, *Chief Judge*: In this appeal, we are asked to

determine whether the landlord, Dianne Quander, waived the deadline for the

tenant, SJ Enterprises', lease renewal option, by her actions and communications with the tenant after the renewal option deadline had already passed.[1]

In the present case, after the lease renewal option deadline had passed but before the original contract term expired, Ms. Quander e-mailed SJ Enterprises. The subject line of the e-mail stated: "reminder of lease increase and renewal." In the body of the e-mail, Ms. Quander wrote the following:

> I just wanted to remind you that your first five[-]year lease agreement comes to an end on November 30, 2015. Please confirm that you want to continue with the lease. There is an increase of 3% each year starting in December , 2015 [sic] and the rent will be $4326 a month.

At trial, Ms. Quander claimed that the e-mail was an inquiry as to whether SJ Enterprises would be remaining at the property after the initial lease term ended, in a holdover tenancy, which she could terminate upon thirty-days' notice. SJ Enterprises, however, testified that it believed that the e-mail constituted an offer to renew the lease for an additional five-year term, which it accepted by

---

[1] A renewal option is an option within a lease agreement that assigns to the tenant the right to extend the lease. Typically, renewal options have a deadline, whereby the tenant must exercise the intent to renew the lease by providing adequate notice to the landlord by a specified date or the waiver of the option to extend the lease.

responding to the e-mail: "Thanks, Dianne, for the reminder. Will start next month."

The trial judge found in favor of SJ Enterprises on an alternative legal theory, that the parties' e-mail exchange constituted a new five-year lease agreement, but the trial judge limited the new lease to one year because it violated the statute of frauds, D.C. Code § 42-306(b) (2012 Repl.). However, we conclude that Ms. Quander's e-mail constituted a clear and unequivocal waiver of her right to timely notice of SJ Enterprises' option to renew for an additional five-year term, which the tenant accepted and exercised by her e-mail response. We therefore reverse and vacate the trial court's decision and remand for the trial court to enter judgment in favor of SJ Enterprises.

## I.  Factual and Procedural Background

In August 2012, SJ Enterprises opened its business, "North Indian/Pakistani bar/restaurant known as 'Cusbah, South Asian Spice Bar'" at the subject property located 1128 H Street Northeast, Washington, D.C. ("Property"). The lease's initial term was for five years, but SJ Enterprises had a Renewal Option under paragraph five of the agreement to renew the lease for up to two additional

five-year terms, so long as SJ Enterprises gave Ms. Quander "not more than twelve (12) and not less than five (5) months' notice of" its intent to exercise the option to extend the lease agreement. The initial lease term was set to expire on November 30, 2015, and SJ Enterprises needed to notify Ms. Quander "of such intention" to exercise the Renewal Option between December 2014 and July 2015. SJ Enterprises did not timely exercise its option.

However, on September 16, 2015, the landlord, Ms. Quander, of her own accord sent SJ Enterprises' co-owner Julie Hussain[2] an e-mail entitled "reminder of lease increase and *renewal*." (Emphasis added). On November 2, 2015, Julie Hussain responded to Ms. Quander's e-mail: "Thanks, Dianne, for the reminder. Will start next month."

Consistent with this e-mail exchange, SJ Enterprises remained in the Property after the initial lease term expired on November 30, 2015, and began paying the increased rent in December 2015. However, on March 16, 2016, Ms. Quander issued SJ Enterprises a Notice to Vacate by April 30, 2016. SJ

---

[2] The e-mail was also sent to Sarosh Hussain. From the record it appears that Sarosh is Soophia Hussain's cousin. However, she does not have a direct role in this case.

Enterprises did not vacate the Property on April 30, 2016, and filed a suit for breach of contract in Superior Court. Ms. Quander counter-sued for a non-redeemable judgment of possession.

At a bench trial on the issue of possession of the Property, the trial judge heard testimony from three witnesses: Landlord, Dianne Quander, and SJ Enterprises co-owners Julie and Soophia Hussain. Ms. Quander testified that the intent behind her September 16, 2015, e-mail was to inquire from SJ Enterprises whether it would be vacating the Property at the end of the initial lease term or if SJ Enterprises intended to remain at the Property on a month-to-month basis as a holdover tenant. However, Ms. Quander's e-mail never used the phrase "month-to-month" or any terminology to suggest that by remaining, SJ Enterprises would be treated as a holdover tenant.

Julie Hussain testified that her understanding of the September 16, 2015, e-mail from Ms. Quander was that Ms. Quander "wanted [Julie Hussain] to respond . . . [with whether SJ Enterprises] wanted to continue with the lease . . . [f]or the next five years;" and if SJ Enterprises was to continue the lease, that the rent would increase. Julie Hussain believed that because she paid the increased rent in December, she was complying with Ms. Quander's e-mail, agreeing to

extend the lease for a second five-year lease term. Soophia Hussain[3] testified consistent with Julie Hussain's testimony, that it was her understanding that they were renewing the lease based on the e-mail exchange and that the rent increase would begin in December 2015.

The trial judge credited Julie and Soophia Hussain's testimony and did not credit Ms. Quander's testimony because he found that her testimony contradicted the plain language of her e-mail. The trial judge held, as a matter of law, that SJ Enterprises did not timely exercise the Renewal Option, that Ms. Quander's e-mail was an offer to enter into a new lease agreement, and SJ Enterprises' response was "a meeting of the minds," which created a new five-year lease agreement.

In coming to his conclusion, the trial judge discussed his belief "that the landlord, by that e-mail of September 16, 2015, *either* extended the period to exercise the option or else made a new offer with the same terms that the option would have included." (Emphasis added). In favoring the latter over the former,

---

[3] Soophia Hussain works at the restaurant and has been the managing partner of SJ Enterprises since October 2014. After Ms. Quander sent the September 16, 2015 e-mail, Soophia Hussain (who was not copied on the e-mail) testified that Julie Hussain described the e-mail to Soophia Hussain as a lease renewal inquiry and if SJ Enterprises were to renew the lease, that it would result in a rent increase from $4,200 to $4,326.

he noted that although the parties were "equally sophisticated" and "probably understood [the renewal option] at the time they entered into the agreement," after a few years had passed, they no longer understood how the option worked. Therefore, because Ms. Quander "did not know how the option worked" "she was [not] in a position to be extending the deadline."

On subsequent motion by the parties, the trial court amended its judgment, holding that the new agreement did not satisfy the statute of frauds, D.C. Code § 42-306(b),[4] and limited the lease term to one year. This appeal followed.[5]

---

[4] D.C. Code § 42-306(b) provides, in part, that:

> [N]o estate of inheritance, or for life, or *for a longer term than 1 year*, in any real property, corporeal or incorporeal, in the District of Columbia, or any declaration or limitation of uses in the same, for any of the estates mentioned, shall be created or take effect, except by deed signed and sealed by the grantor, lessor, or declarant, in person or by power of attorney or by will.

(emphasis added).

[5] Because we reverse the trial court's decision that the parties entered a new contract, we do not reach the issue of whether the statute of frauds applies.

## II. Analysis

We are not persuaded by the trial court's conclusion that the parties intended to enter a new contract. We conclude that the trial judge erred as a matter of law, in concluding that the parties entered a new lease. *See Strauss v. NewMarket Glob. Consulting Grp., LLC*, 5 A.3d 1027, 1032 (D.C. 2010) (The determination of whether an enforceable contract exists is a question of law, which we review *de novo*.) (citation omitted).

Traditional notions of contract formation tell us that "for an enforceable contract to exist, there must be both (1) agreement as to all the material terms, and (2) intention of the parties to be bound." *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 251 (D.C. 2005) (internal citations, quotation marks, and brackets omitted). While we may assume the parties agreed to the same terms in their original written lease, we are unable to find evidence of the parties' "meeting of the minds" or "mutual assent" to be bound to a new contract. *Id*. at 252 (citations omitted). The landlord sent an e-mail that resembled an offer to extend or otherwise to continue with the lease. The trial court viewed the tenant's response as "I accept your offer to renew the lease term." While we accept the trial judge's factual findings as to what the parties did and said prior to extending the lease

agreement, we do not agree with the ultimate conclusion that an enforceable contract was formed by the parties' e-mail exchange and instead conclude that the landlord waived the option deadline.[6]

As the trial judge noted, the tone of the e-mail exchange between the parties was forward-looking and included the phrases, "reminder of lease increase and renewal," "first five-year" term, and "continue with the lease." This tone leads us to conclude that the parties intended to extend the current lease agreement as opposed to beginning a new lease. Further, the parties originally executed a written and signed lease agreement, which contradicts the conclusion that the parties abandoned that lease practice for a supposed second lease agreement via e-mail. *See Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995).

The Renewal Option states:

---

[6] Although our concurring colleague has expressed his view that waiver is typically a question for the factfinder, we respectfully draw attention to the well-established principle that "waiver is a question of law where the facts and circumstances relating to the subject are . . . clearly established," which in our view, is the case here. *Word v. Ham*, 495 A.2d 748, 751 (D.C. 1985) (citing 28 AM. JUR. 2D *Estoppel and Waiver* § 174 (1966)) (internal quotation marks and alterations omitted).

> Tenant shall have the option, at its sole discretion, to renew for two (2) additional periods, each consisting of five (5) years. Tenant may extend its tenancy, provided it is not in default, by giving Landlord not more than twelve (12) months and not less than five (5) months notice of such intention.

After the Renewal Option expired, Ms. Quander sent SJ Enterprises an e-mail titled "reminder of lease increase and renewal," which contained the phrases: "remind you that your first five[-]year lease agreement" is ending soon, "[p]lease confirm that you want to continue with the lease," and there will be "an increase of 3% each year starting in December , 2015" (the month after the initial lease term was set to end).

Typically, this court strictly construes renewal options and their deadlines. They are often treated as either conditions precedent[7] or categorized as "time is of the essence"[8] provisions which if not adhered to will render the renewal option

---

[7] "A condition precedent may be defined as 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'" *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 86 (D.D.C. 2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 224 (AM. LAW INST. 1981)).

[8] A "time is of the essence" clause makes strict timeliness a requirement. The clause may be included in a contract either explicitly or through "[a]ny words which provide in unequivocal language that if the terms of the contract are not

(continued . . .)

void. 8 CORBIN ON CONTRACTS § 40.4 at 533 (rev. ed. 1999). Specifically, where a "primary contractual obligation" of a landlord's renewal option "is subject to a condition" that the tenant exercise that option within a specified period of time and the tenant fails to do so, the landlord's duty to renew "is discharged" because the "condition can no longer be performed." *Id*. (The landlord's duty to renew the lease for another term "was subject to a condition, a condition that now can never be performed.").

Nevertheless, a landlord can waive his or her own legal right to timely notice of a renewal option and, in effect, resurrect the option belatedly, through words or conduct. *See Harris v. Gindes*, 265 A.2d 598, 599 (D.C. 1970) (Notice of renewal requiring that a tenant give notice to the landlord that it intends to renew the lease term is "for the landlord's benefit and could be waived by him."). This is because waiver "is an equitable principle designed to avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair. It serves to prevent a party from insisting on a right upon which he could have insisted earlier but has [been] found to have surrendered." *Nortel Networks*, 298 F. Supp. 2d at 88 (internal citation and quotation marks omitted); *see also Boswell v. Panera Bread*

(. . . continued)

fulfilled within a specified period of time, the contract is to be void[.]" *Siegel v. Banker*, 486 A.2d 1163, 1165 (D.C. 1984) (internal citation omitted).

*Co.*, 879 F.3d 296 (8th Cir. 2018). Moreover, a waiver need not be explicit, "but may be inferred from conduct inconsistent with an intent to enforce that right." *Nortel Networks*, 298 F. Supp. 2d at 88 (internal citations omitted); *see also LanQuest Corp. v. McManus & Darden LLP*, 796 F. Supp. 2d 98, 102-03 (D.D.C. 2011) (internal citations omitted) (Under District of Columbia law, "even where there is a written contract, a party's course of conduct can constitute a waiver of specific contractual provisions and be relied upon by the parties as a modification of any enforceable contract that exists between the parties.").[9]

The facts credited by the trial court demonstrate that Ms. Quander waived her right to timely notice of renewal through her words and conduct by reaching out to SJ Enterprises with her September 16, 2015 e-mail after the renewal option period had expired. Her use of the words "reminder," "renewal," "first," "continue," and "each year," evinced an intent to waive the option deadline found

---

[9] *See also DeSantis v. Randolph*, 430 N.Y.S.2d 457, 458-60 (N.Y. App. Div. 1980) (holding that after the renewal period has ended, "[o]nce an offer of renewal has been made to a tenant, and especially after the acceptance of that offer by the tenant, the landlord may not [escape liability] to defeat the tenant's right to a renewal lease"); *Wolf v. Tastee Freez Corp. of Am.*, 109 N.W.2d 733, 735-38 (Neb. 1961) (The court held that the landlord could have waived "by conduct if not in words,"—calling tenant, asking to initiate settlement negotiations, and assuring tenant that he "would have until Spring to decide whether to extend the lease"—his right to timely, written notice requirement as required by the lease.).

within the lease agreement. Specifically, Ms. Quander's September 16, 2015 e-mail titled "*reminder* of lease increase and *renewal*" stated, in part:

> I just wanted to *remind* you that your *first* five[-]year lease agreement comes to an end on November 30, 2015. Please confirm that you want to *continue* with the lease. There is an increase of 3% *each year* starting in December , 2015 [sic] and the rent will be $4326 a month.

(Emphases added). SJ Enterprises replied: "Thanks, Dianne, for the reminder. Will start next month." The most obvious example of Ms. Quander's intent to waive the option provision and to renew the lease for an additional five-year term, was her use of the term "renewal." The trial judge specifically did not credit Ms. Quander's testimony that her use of the term "renewal" in the e-mail was just "a bad choice of words" and was "not what [she] meant." The trial judge found that "[t]he language [she chose] is quite specific and it's very different from saying it's a reminder of the lease termination and [SJ Enterprises'] holdover status. There were many other ways to express what Ms. Quander now says she was trying to express which is the lease is over [and y]ou're in a holdover status[.]" If Ms. Quander believed then what she testified to at trial, then her language, according to the trial judge's finding, would have reflected such an understanding; "her use of the language seems unnatural . . . given what else she might have said at the time."

The trial judge further found that Ms. Quander's use of the term "*first* five [-]year lease" also implies that the e-mail was an attempt by Ms. Quander to enter into a *second* five-year lease term with SJ Enterprises pursuant to the Renewal Option. (Emphasis added). In addition, Ms. Quander's request that SJ Enterprises confirm that it intends to "*continue* with the lease" and Ms. Quander's notification that the rent would increase "*each year*" are also strong indications of Ms. Quander's intent to waive the Renewal Option. (Emphases added). Using the term "continue" in this context indicates Ms. Quander's intent to remain under the status quo of and continue with the original lease. As the trial judge noted, Ms. Quander's behavior of working with SJ Enterprises to resolve issues continued with the September 16th e-mail "where she's putting it on the table . . . here are the terms for moving forward." Ms. Quander's use of the terms "first," "each year," and "continue" are strong indications of her intent to renew the lease and continue the tenancy over an extended period of time. Further, Ms. Quander's use of the term "reminder" is also compelling as she is calling to SJ Enterprises' attention that this lease renewal has not yet been resolved and needs to be. Taken together, Ms. Quander's action of contacting SJ Enterprises after the option period had expired, with an e-mail offering to "renew" and to "continue with the lease" demonstrates Ms. Quander's intent to waive the option deadline. *See DeSantis*,

430 N.Y.S.2d at 458. In this context, SJ Enterprises' reliance on Ms. Quander's e-mail was reasonable.

The trial judge also emphasized that Ms. Quander's general attitude was forward-looking. A review of the second portion of Ms. Quander's September 16, 2015 e-mail underscores this point:

> Also be aware that my insurance on the building has increased because of *issues in the restaurant* that need to be taken care of. I think the building manager Ken Ross has made your management aware of these issues. You will have to pay the additional increase of $540 *if the problems are not addressed as soon as possible*.
>
> There is also a tax issue *that needs to be discussed bbut* [sic] *can wait until I return*.
>
> Hope all is well. If you have any questions, please let me know.

(Emphases added). Had Ms. Quander intended for the tenancy to conclude or continue in a short term holdover tenancy, there would be no need to address a future insurance increase and "tax issues," which are contingent on SJ Enterprises occupying the premises for the foreseeable future.

In addition, the trial court found it compelling that Ms. Quander failed to take any steps after the renewal period ended to find a new tenant. Had Ms.

Quander actually felt "concerned about keeping the property rented," as she testified to feeling, "one would have expected her to take some additional steps consistent with that." The tone of the e-mails and Ms. Quander's accompanying behavior are "more consistent with a landlord who'd settled on a tenant that was going to be there for a while." Therefore, Ms. Quander's behavior constituted a waiver of timely notice of the renewal option and it was reasonable for SJ Enterprises to rely on such behavior.[10]

---

[10] Our concurring colleague primarily points out that Ms. Quander could not have intended to waive the option deadline based on the trial judge's observation that Ms. Quander did not know that there was a deadline operating. However, in our view, Ms. Quander intended to offer SJ Enterprises the option to renew the lease. The record supports our conclusion that Ms. Quander did in fact intend her actions. "[E]ach party has the burden to read and understand the terms of a contract before [] she affixes [] her signature to it." *McCleve Props., LLC v. D. Ray Hult Family Ltd. P'ship*, 307 P.3d 652, 655 (Utah Ct. App. 2013) (citation omitted). Therefore, "parties are charged with knowledge of the terms of the contracts they enter into," and as a consequence, "parties are not permitted to show that they did not know a contract's terms, and in the absence of fraud or mistake they will be bound by all its provisions, even if they have not read the agreement and do not know its contents." *Id.* (citations, quotation marks, and brackets omitted). The trial court found that Ms. Quander was a sophisticated party and therefore, "probably understood [the renewal option] at the time [the parties] entered into the agreement." So even though the trial court also observed that Ms. Quander did not know that there had been a deadline operating, she is bound by the terms of the contract, and likewise could waive provisions of the contract that were contained therein and for her benefit.

### III.   Conclusion

For the foregoing reasons, we are satisfied that Ms. Quander's conduct and language waived the timely notice requirement. The waiver allowed SJ Enterprises to exercise its option to renew the lease for a second five-year term.

*Vacated and remanded*.

FERREN, *Senior Judge*, concurring in the judgment. This case presents the question whether (1) the parties — landlord Quander and tenant SJ Enterprises — extended their lease for five years, pursuant to its original terms, by virtue of the landlord's waiving the time limit on the tenant's expired option to renew; or, if not, (2) whether the parties nonetheless achieved the same result by entering into a new lease by email, incorporating the same terms and longevity as the lease option, which was unaffected by the one-year limitation otherwise imposed by the "statute of frauds."[1] The opinion for the court interprets the transaction as a "renewal" based on "waiver." From that interpretation I respectfully dissent. Like the trial court, I understand the situation to have resulted in a "new lease." Unlike the trial court, however, I conclude that the "admission" exception to the statute of frauds erases the one-year limitation here. As a result, like my colleagues, I would reverse and remand for entry of judgment for the tenant, sustaining the claim of SJ Enterprises for the contractual right to another five-year lease of the premises from landlord Quander.

---

[1] D.C. Code § 42-306(b) (2012 Repl.) ("[N]o estate . . . for a longer term than 1 year, in any real property, . . . shall be created or take effect, except by a deed signed and sealed by the grantor. . . .").

**I.**

As to outcome, the approach that justifies the additional five years makes no difference. Conceptually, however, there is distinction worth elaborating. Since at least 1936, binding case law[2] has defined waiver in this context as an "intentional relinquishment of a known right."[3] Although "[i]ntent to waive a known right . . . may be inferred from conduct inconsistent with an intent to enforce that right,"[4] the question of waiver ultimately "turns on the intent of the party ostensibly waiving the right, a state of mind which must be culled from the specific facts and circumstances surrounding the purported relinquishment."[5] Therefore, "[w]hether waiver has occurred is typically a question for the trier of fact."[6]

---

[2] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court or refuse to follow a decision of the United States Court of Appeals rendered prior to February 1, 1971[.]").

[3] *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936) (citation omitted); *accord Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 88 (D.D.C. 2004) ("Waiver is an intentional relinquishment or abandonment of a known right or privilege.") (internal quotation marks and citation omitted).

[4] *Nortel Networks*, 298 F. Supp. 2d at 88.

[5] *Id.* (quoting *Britamco Underwriters, Inc. v. Nishi, Papagjika & Assoc., Inc.*, 20 F. Supp. 2d 73, 77 (D.D.C. 1998)).

[6] *Id.* (citing *Safer v. Perper*, 569 F.2d 87, 99 (D.C. Cir. 1977); *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F.Supp.2d 60, 65

(continued . . .)

The trial court found that on September 16, 2015 — two and one-half months after the "renewal option" had expired — Ms. Quander emailed SJ Enterprises with the "reminder of lease increase and renewal." At that time, said the court, she "did not know how the option worked," so she was not "in a position to be extending the deadline." In fact, "she didn't know that there had been a deadline operating." The court further found that the Hussain family, which owned SJ Enterprises, may have known about the option provision when they "entered into the agreement," but by the time they received Ms. Quander's email, the Hussains "didn't even know that there was" an option provision; they "assumed that [renewal] was sort of an automatic thing." These factual findings are supported by the record and are not clearly erroneous.[7] From these factual

---

(. . . continued)

(D.D.C. 2001); *Britamco Underwriters, Inc.*, 20 F. Supp. 2d at 77; *Radiation Systems, Inc., v. Amplicon, Inc.*, 882 F. Supp. 1101, 1105 (D.D.C. 1996)). I agree with my colleagues that, in some cases, "whether undisputed or clearly established facts constitute waiver may, like countless other factual issues posed in litigation, be a question appropriate for summary resolution." *Nortel Networks*, 208 F. Supp. 2d at 88 (citing *Word v. Ham*, 495 A.2d 748, 751 (D.C. 1985)). However, I do not view this case — which went to a bench trial — as one in which "the facts are not in dispute or are beyond dispute" or in which "only one inference can reasonably be drawn from the evidence." 28 Am. Jur. 2d Estoppel and Waiver § 174 (cited in *Word*, 495 A.2d at 751).

[7] *See* D.C. Code § 17-305 (2012 Repl.).

findings, the trial court concluded that Ms. Quander did not intentionally waive, and the Hussains did not intentionally exercise, the option to renew the lease.

I recognize that this issue is not quite as simple as the trial court's analysis may imply. There may be cases in which one is deemed to "know" a legal right which has been forgotten, or in which one is deemed to have "intentionally" waived a right without making a conscious mental decision.[8] But where, as here, the allegedly waived right is entirely forgotten by both parties, and thus neither party could have anticipated a waiver, it seems to me more than a little surreal to conclude that landlord Quander "intentionally" abandoned or relinquished a "known" right, and that the tenant — although unaware of the option — somehow exercised it. The most that can be said for Ms. Quander on this record is that, if she had known about the option deadline, she likely would have waived it. But such speculation, even if reasonable, stretches the concept of "intentionally" waiving a "known" right to an outer limit approaching a severe legal fiction.

---

[8] *Cf. Harris v. Gindes*, 265 A.2d 598, 599 (D.C. 1970) (stating that a landlord's intent to waive a notice deadline could be inferred from its acceptance of increased rent not otherwise required by the lease).

In sum, there is no getting around the trial court's findings — not clearly erroneous — that Ms. Quander was entirely ignorant of the option deadline, and thus entirely free from any conscious intent to waive that deadline.[9] Nor is there any basis for believing that SJ Enterprises, entirely unaware of the option, made any effort to exercise it. I am troubled by a legal analysis that turns on deeming each party to have done something that each was unaware of, especially when the trial court's alternative analysis leads the way to the same result my colleagues achieve.

This is not a case in which tenant SJ Enterprises will be prejudiced if Ms. Quander's supposed waiver is rejected. The trial court's analysis, at least in part, demonstrates a more realistic understanding of the situation. The record supports the trial court's finding that the parties intended to continue their landlord-tenant relationship for five years, despite Ms. Quander's testimony (found incredible) that she had sought to retain SJ Enterprises only as a month-to-month tenant. Given this manifest intent, and the barriers to finding a "waiver" of the option deadline by Ms. Quander, the trial court appropriately concluded that Ms. Quander's September 16, 2015 email is "more properly deemed" to be "a new offer with the

---

[9] *See C.I.T. Corp.*, 85 F.2d at 811 (concluding that a party did not waive a right of which it was "unaware").

same terms that the option would have included." The trial court further determined that the tenant expressed an intent to accept this offer by responding, "Thanks, Diane, for the reminder. Will start next month." The tenant confirmed its understanding that the lease had been "renewed" by continuing to act as if the lease remained in full force on more than a monthly basis.

An enforceable contract requires "both an agreement as to all the material terms and an objective manifestation of the parties' intent to be bound [by the agreement]."[10] In determining whether these requirements have been satisfied, "the intentions of parties to a contract must be determined not only from the terms of the written agreement but also from the actions of the parties in relation thereto."[11] Here, it is clear from the landlord's September 16, 2015 email, which expressly offered to "renew[]" and "continue with the lease," that the "material terms" of the parties' agreement were the same as those contained in their original written lease. And the tenant's response to the landlord's email, coupled with the parties' subsequent conduct, indicates the parties' intent to be bound by their

---

[10] *Strauss v. NewMarket Glob. Consulting Grp., LLC*, 5 A.3d 1027, 1033 (D.C. 2010).

[11] *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) (quoting *Bergman v. Parker*, 216 A.2d 581, 583 (D.C. 1966)) (alteration adopted).

agreement: (1) The tenant remained on the property after the original lease had expired; (2) the tenant paid the increased rent requested in the landlord's email and required by the lease; (3) the landlord added, without objection, that the tenant might be required to pay an additional annual insurance premium, which was not pro-rated on a month-to-month basis; (4) the tenant paid "public space rental fees" for sidewalk tables (to be passed on to the District government) through 2017; (5) the tenant did not search for a new property after the original lease had expired; and (6) the landlord did not take steps to re-let the property after that expiration until more than five months later when Ms. Quander decided to challenge the lease.[12] In sum, I agree with the trial court's conclusion that the parties entered into an enforceable new lease, separate from the lease option (of which they were unaware).

---

[12] As confirmed by their conduct, the parties' email exchange did not express "a mere agreement to agree," *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 339 (D.C. 2015) (citation omitted), or "contemplate[] the preparation and execution of additional documentation," *id.* at 342 (citation omitted), but instead was intended by the parties to modify their contractual rights and obligations going forward, *see Dryer v. Bilaal*, 983 A.2d 349, 357 (D.C. 2009) (concluding that the parties intended to be bound by an email exchange); *Duffy v. Duffy*, 881 A.2d 630, 637 (D.C. 2005) ("[A]ppellant's actions demonstrated his intent to be bound[.]").

**II.**

I part ways with the trial court when it comes to the statute of frauds.[13] "The District of Columbia requires estates in real property for more than one year to be created by an instrument under seal."[14] Because the parties' agreement was not created by an instrument under seal, it falls within the statute of frauds. But that statute was not devised to reduce to one year every contract that falls short of the statute's formal requirements; it was "intended to guard against the perils of perjury and error in the spoken word, and to protect defendants against unfounded and fraudulent claims."[15] These concerns, however, do not apply when a party admits to having said or written the words attributed to that party. We have therefore held that a party waives the statute of frauds defense if the party admits or stipulates to facts that establish the elements of a valid contract.[16]

---

[13] See *supra* note 1.

[14] *Tauber v. District of Columbia*, 511 A.2d 23, 27 (D.C. 1986); D.C. Code § 42-306(b) (2012 Repl.).

[15] *Hackney v. Morelite Const.*, 418 A.2d 1062, 1065-66 (D.C. 1980) (quoting 3 Williston on Contracts § 448 at 344 (3d ed. 1960)).

[16] *Id.* at 1067-69 (holding that appellee waived the defense where he stipulated to facts which "establish[ed] the elements of a valid option contract"

(continued . . .)

Landlord Quander testified that she had drafted and sent the September 16, 2015 email to the tenant, and received the tenant's November 2, 2015 reply. In doing so, she testified to facts sufficient to establish the existence of a valid contract (while resisting that legal conclusion), and the parties' agreement was accordingly taken outside of the statute of frauds.

For these reasons, I conclude that the trial court erred by failing to give the parties' intent to enter into a new lease for a five-year term full effect, and that the order on appeal must be vacated and the case remanded.

---

(. . . continued)

despite his assertion that "there was no meeting of the minds as to . . . an essential term of the contract"); *see also Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 362 (D.C. Cir. 1983) (interpreting *Hackney* to stand for the proposition that a party "waives the protection of the statute of frauds, and hence is barred from asserting it defensively, by admitting . . . either the making of the contract *or facts sufficient to establish its existence*") (emphasis added); *Lewis v. Hughes*, 346 A.2d 231, 256-57 (Md. 1975) ("We come then to the basic issue in this case, which is whether the Statute of Frauds is satisfied . . . when the party denying the existence of the contract and relying on the Statute takes the stand and, without admitting explicitly that a contract was made, testifies to facts which as a matter of law establish that a contract was formed. . . . [N]umerous cases . . . seem to say that in such a situation the requirements of the Statute have been fulfilled."); 10 Williston on Contracts § 27:10, n.22 (4th ed. 2011) (collecting cases).